RAFAEL M. GONZALEZ, JR.
UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
CHRISTIAN S. NAFZGER, IDAHO STATE BAR NO. 6286
JUSTIN WHATCOTT, IDAHO STATE BAR NO. 6444
JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
ASSISTANT UNITED STATES ATTORNEYS
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO,<br>KRISTINA BABICHENKO,<br>DAVID BIBIKOV,<br>ANNA IYERUSALIMETS,<br>MIKHAIL IYERUSALIMETS,<br><br>Defendants. | Case No. 1:18-cr-00258-BLW<br><br><br>**GOVERNMENT'S RESPONSE TO DEFENDANT MIKHAIL IYERUSALIMET'S SECOND MOTION TO EXCLUDE EVIDENCE OF HARM AND DANGEROUSNESS (ECF 1306)** |

Testimony and evidence related to the electrical failures of counterfeit chargers should be admitted at trial. Accordingly, the Defendants' renewed motion to prevent testimony related to such evidence should be denied. The remaining categories of evidence the defense seeks to admit will not be offered by the Government. Accordingly, those points are moot.

GOVERNMENT'S RESPONSE TO DEFENDANTS'
RENEWED MOTION TO EXCLUDE EVIDENCE OF HARM—1

**RELEVANT BACKGROUND**

In 2016, Underwriter Laboratories ("UL") conducted testing on 400 counterfeit Apple-style cellphone chargers and published a study of the results, explaining the dangers posed to consumers of these counterfeit Apple-style cellphone chargers (hereinafter "White Paper"). *See* ECF 340-5. UL reported a 99% fail rate among the counterfeit iPhone chargers in the electrical strength test. *See id.* In the same study, UL determined that 12 of the 400 tested chargers posed a risk of lethal electrocution. *See id.* This risk is a natural byproduct of counterfeit cellphone chargers' poor and inconsistent manufacturing quality. *See id.* ("[P]ower adapters bearing counterfeit UL marks typically contain less sophisticated circuits, fail to deliver their advertised current and voltage, and fail when tested to safety standards.").

In 2020, the Government noticed Mr. Robert Pollock as testifying to both the broad danger that counterfeit products pose to consumers, as well as the particular findings of the White Paper. The Government likewise produced the White Paper and underlying data (made available to defense counsel through inspection at the United States Attorney's Office) to the defense. The defense challenged Mr. Pollock's expert testimony under Rule 702 in a motion to exclude and through a lengthy cross-examination during a *Daubert*[1] hearing. *See* ECF 871, 91–127. Ultimately, the Court held that Mr. Pollock was qualified as an expert to testify on the noticed topics. As to the White Paper, however, the Court determined that the testimony was not sufficiently tethered to the particular products sold by the Defendants to be admissible. *See* Trial Tr. Day 19, at 3105:22–3106:02. Nevertheless, the Court concluded that Mr. Pollock could testify as to "why safety is a concern, why UL

---

[1] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

so zealously enforces its rights . . . and tie his testimony to evidence already in the record." *See id.* at 3105:22–3106:02.

In accordance with these rulings, Mr. Pollock testified to UL's safety standards, certification process, and the broader dangers that counterfeit products pose to the public. Mr. Pollock likewise testified to the lack of traceability and accountability with counterfeit goods. In response, the defense called an electrical engineering expert, Neil Shirk, who had performed his own electrical testing on chargers seized in this case—including a sample of those purchased from Pavel Babichenko in a hand-to-hand undercover buy charged in count 22. During trial, Mr. Shirk testified that the Defendants' chargers, on which he performed destructive testing, had a "rock solid, good performance," and a "very consistent . . . outstanding performance." *See* Trial Tr. Day 30, at 5680.

Since trial, Mr. Pollock and his team have conducted electrical strength testing on 117 of cellphone chargers seized from the Defendants. *See* ECF 1288, at 2. Of the 117 chargers seized from the Defendants and tested, all failed the testing. The Defendants' products failed in the lab and in real life. Kari Krause testified during the first trial that the charger she purchased from Wireless Closeouts—Kristina Babichenko's business—hissed when it was plugged into the electrical outlet. *See* Trial Tr. Day 5, at 210; 164:20–:22 ("So it just started to hiss which is a pretty remarkable thing for a charger to do."). That is exactly the type of failure the electrical stress test uncovers. Steve Kroll experienced a similar failure: a charger he purchased from Cell2U4Less—an entity run by Arthur Pupko for Pavel Babichenko—started hissing and got hot the first time he plugged it in.

In the Defendants' renewed motion, they seek to exclude all evidence and argument of the harm posed by counterfeit contraband as irrelevant and unfairly prejudicial. Specifically, they seek to exclude three categories related to this evidence:

1. Safety tests on devices unrelated to the Defendants' products, like the White Paper, *see* ECF 1316, at 9;

2. Speculative testimony from the victims and testimony that they were "unsettled" by the hissing and popping of chargers purchased from the Defendants, *see id.* at 3–4, 8–9;

3. Testimony from brands regarding specific instances of people being harmed by counterfeit products that were not the Defendants' products, *see id.* at 8.

The Government does not intend to elicit Categories 2 or 3 from these witnesses and will instruct each witness not to discuss these topics. Accordingly, the Defendants' motion on these points is moot. As to the first category, the Government will seek to elicit testimony from Mr. Pollock as to UL's research underpinning the White Paper. Originally, the Court precluded testimony as to the White Paper after determining that the research was not connected to the Defendants' products. Unlike the first trial, however, UL has since conducted testing on the Defendants' products that directly parallels the study in the White Paper. Accordingly, the testimony as to the latter should be admitted at trial.

## LEGAL FRAMEWORK

A motion in limine is a "procedural mechanism to limit in advance testimony or evidence in a particular area." *United States v. Heller*, 551 F.3d 1108, 1111 (9th Cir. 2009). District courts have broad discretion to make evidentiary rulings to ensure a fair and orderly trial. *See, e.g.*, *S.M. v. J.K.*, 262 F.3d 914, 919 (9th Cir. 2001). Within this broad discretion,

courts may rule on the relevancy of the proffered evidence. *See, e.g.*, *Self Storage Advisors, LLC v. SE Boise Boat & RV Storage, LLC*, No. 1:18-cv-294, 2021 WL 1238368, at *1 (D. Idaho Apr. 2, 2021). A motion in limine should not, however, be used to resolve factual disputes or weigh evidence. *C&E Servs., Inc., v. Ashland Inc.*, 539 F. Supp. 2d 316, 323 (D.D.C. 2008). To exclude evidence on a motion in limine, "the evidence must be inadmissible on all potential grounds." *See Ind. Ins. Co. v. Gen. Elec. Co.*, 326 F. Supp. 2d 844, 846 (N.D. Ohio 2004). Rulings in limine are provisional: they "are not binding on the trial judge [who] may always change [her] mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000). Accordingly, denials of motions in limine merely mean that "without the context of trial, the court is unable to determine whether the evidence in question should be excluded." *Ind. Ins. Co.*, 326 F. Supp. 2d at 846.

## ARGUMENT

In its prior ruling, the Court recognized that potential hazardousness can be a byproduct of "poor product quality, which is relevant to whether a product is counterfeit, including the potential for confusion, mistake, or deception." *See* Order, ECF 945, at 9–13. The Court rightfully held that "counterfeit products may mislead the public into believing the proper trademark holder is responsible for the safety concerns caused by the products." *Id.* at 10. Nothing warrants disruption of this Court's prior ruling.

Trademark owners are victims of trademark-counterfeiting; they enjoy an exclusive right to prohibit others from trafficking in the spurious versions of goods and services bearing their marks, whether they take the form of words, names, symbols, devices (or some combination thereof) that indicate the source of particular goods. *See Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017); *see also* 18 U.S.C. § 2320. Congress crafted Section 2320, not only to

GOVERNMENT'S RESPONSE TO DEFENDANTS'
RENEWED MOTION TO EXCLUDE EVIDENCE OF HARM—5

protect consumers from deception or harm, but also as a means of protecting against "*the cheapening and dilution of the genuine product*." *United States v. Hon*, 904 F.2d 803, 806 (2d Cir. 1990) (emphasis added). In other words, "[o]ne of the rights that a trademark confers upon its owner is the right to control the quality of the goods manufactured and sold under that trademark." *United States v. Farmer*, 370 F.3d 435, 441 (4th Cir. 2004) (internal quotation marks omitted).

This right, however, is exclusive to mark holders, and Defendants cannot defend against trademark-counterfeiting charges by claiming that their products were of a similar quality. *See Farmer*, 370 F.3d at 441 ("[I]t is the control of quality that a trademark holder is entitled to maintain."). This means that product quality, though irrelevant when raised by a defendant, is relevant and probative of whether an item is counterfeit because mark holders determine whether contraband lives up to their own standards. *See id.* ("[T]he whole point is that deciding whether shirts pass muster is reserved to [the trademark holders], not to [the defendant].").

In fact, when considered against a defendant, product quality is probative of numerous legitimate issues at trial, including whether a defendant knew (or should have known) that certain items were indeed counterfeit. *See, e.g.*, *Levi Strauss & Co. v. Diaz*, 778 F. Supp. 1206, 1208 (S.D. Fla. 1991) ("It is clear . . . that the goods transported to France were not of the type or quality normally produced by Levi Strauss. The goods were of such inferior quality, that even a minimal inquiry . . . would have disclosed their counterfeit nature."). Product quality may also bear upon a defendant's state of mind. *See, e.g.*, *United States v. Yi*, 460 F.3d 623, 630 (5th Cir. 2006) (noting that "[t]he noticeably poor quality of most of the goods, purchased in a store owned by Zheng, provides further support" for the

defendant's intent).  It may also be relevant to showing the existence of a counterfeit scheme in much the same way that evidence of loss directly bears upon the existence of a scheme to defraud.  *See, e.g.*, *United States v. Rasheed*, 663 F.2d 843, 850 (9th Cir. 1981) (observing that although "[t]he mail fraud statute does not require proof that anyone has been defrauded . . . [s]uch evidence may be relevant to show that a scheme to defraud existed" (internal quotation marks omitted)).

Finally, evidence of poor quality, including the potential for harm caused by that poor quality, is directly relevant to establishing a likelihood of confusion, mistake, or deception.  *See* 18 U.S.C. § 2320(f)(1)(A)(iv).  If a product, for example, bears an Apple trademark but is not an Apple product, that item is inherently fraudulent and almost certainly deceptive.  But there is more.  Many of the hundreds, if not thousands, of fake products in this case carry additional misleading indicators of reliability that signal to the consumer that the products are not only legitimate, but also backed by assurances of safety and dependability.  One such indicator is a counterfeit certification mark from UL, which— if legitimate—is included by companies like Apple and Samsung as assurances of product integrity.  A counterfeit Apple product, however, that carries a UL mark thus includes a double layer of deception—that not only Apple made and stands by the product, but also that a company like UL has certified that product's safety.

Thus, there exists a very real danger "when potential purchasers of [a trademark holder's] goods see unauthentic goods and identify these goods with the trademark holder." *United States v. Torkington*, 812 F.2d 1347, 1353 (11th Cir. 1987).  When counterfeiters flood the market with illicit contraband, victim brands not only lose control over the quality of

those products, but they also lose control over any issues related to harm or dissatisfaction.[2]
*See Hon*, 904 F.3d at 806 ("[C]ounterfeiters [can earn] enormous profits . . . by capitalizing
on the reputations, development costs, and advertising efforts of honest manufacturers at
little expense to themselves."). If an individual customer purchases a dangerous item that
bears an Apple trademark, for example, but that was not actually produced by Apple, that
customer—at a minimum—is left with a negative impression of the brand, not the
counterfeiter. Given this, "[i]t is easy to see . . . why trademark holders like [Apple] and
[Samsung] are accorded the right to control the quality of their goods," especially when a
defendant's items are "almost certainly of inferior quality." *See Farmer*, 370 F.3d at 441.
The Defendants' attempts to weaponize relevance and undue prejudice serve only to distract
from legitimate inquiries into their years-long pattern of capitalizing on honest brands, at
consumers' expense, while bearing none of the brand holders' risks and responsibilities.

That some of this evidence may produce an emotional response is not enough to
exclude them under Rule 403. The testimony underpinning the White Paper is relevant,
directly ties into the testing performed on the Defendants' products, and is probative
evidence of possible harm. The Defendants cannot selectively seek exclusion using Rule
403 as a pretense to sanitize potentially inconvenient facts. *See United States v. Hankey*, 203
F.3d 1160, 1172 (9th Cir. 2000).

---

[2] The Defendants attempt to sidestep this legal framework, arguing that "genuine
products are introduced into the stream of commerce every day that malfunction, are
recalled as defective, or cause injury." ECF 1316, at 6. That is an exercise in smoke and
mirrors. Trademark holders enjoy an exclusive right to control the quality of their products,
but that also means they assume potentials risks of malfunctions or public-relations events.
Counterfeiters, by contrast, enjoy the goodwill and security engendered by the name
recognition of branded items while assuming none of the reputational risks, developmental
costs, or product-liability concerns assumed by mark holders. *See Hon*, 904 F.3d at 806.

GOVERNMENT'S RESPONSE TO DEFENDANTS'
RENEWED MOTION TO EXCLUDE EVIDENCE OF HARM—8

## CONCLUSION

For the reasons discussed herein, the Government respectfully requests that the Court deny the defense's renewed motion to exclude evidence of the White Paper (Category 1), and find the motion moot as to speculative testimony from victims and brands, as well as moot regarding harm to unrelated parties (Categories 2 and 3).

RAFAEL M. GONZALEZ, JR.
UNITED STATES ATTORNEY
By:

*/s/ Katherine L. Horwitz*
KATHERINE L. HORWITZ
Assistant United States Attorney

*/s/ Christian Nafzger*
CHRISTIAN NAFZGER
Assistant United States Attorney

*/s/ Justin Whatcott*
JUSTIN WHATCOTT
Assistant United States Attorney

*/s/ Joshua D. Hurwit*
JOSHUA D. HURWIT
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 28, 2022, the foregoing was electronically filed

with the Clerk of the Court using the CM/ECF system, and that a copy was served on the

following parties or counsel by ECF filing:

| |
|---|
| JOHN DEFRANCO<br>1031 E. Park Blvd.<br>Boise, ID 83712<br>jcd@greyhawklaw.com<br>*Attorney for Pavel Babichenko* |
| PAUL E. RIGGINS<br>380 South 4th Street, Ste. 104<br>Boise, ID 83702<br>rigginslaw@gmail.com<br>*Attorney for Piotr Babichenko* |
| ROB S. LEWIS<br>913 W. River Street, Ste. 430<br>Boise, ID 83702<br>office@roblewislaw.com<br>*Attorney for Timofey Babichenko* |
| GREG S. SILVEY<br>P.O. Box 5501<br>Boise, ID 83705<br>greg@idahoappeals.com<br>*Attorney for Kristina Babichenko* |
| ROBYN A. FYFFE<br>P.O. Box 5681<br>Boise, ID 83705<br>robyn@fyffelaw.com<br>*Attorney for David Bibikov* |

GOVERNMENT'S RESPONSE TO DEFENDANTS'
RENEWED MOTION TO EXCLUDE EVIDENCE OF HARM—10

MELISSA WINBERG
702 W. Idaho Street, Ste. 1000
Boise, ID 83702
Melissa_Winberg@fd.org
*Attorney for Anna Iyerusalimets*

ELLEN NICHOLE SMITH
P.O. Box 140857
Garden City, ID 83714
ellen@smithhorras.com
*Attorney for Mikhail Iyerusalimets*

/s/ *Katherine Horwitz*
Assistant United States Attorney

GOVERNMENT'S RESPONSE TO DEFENDANTS'
RENEWED MOTION TO EXCLUDE EVIDENCE OF HARM—11