## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 1:18-cr-00258-BLW |
| Plaintiff, | |
| v. | FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER |
| PAVEL BABICHENKO, PIOTR BABICHENKO, TIMOFEY BABICHENKO, and MIKHAIL IYERUSALIMETS, | |
| Defendants. | |

## INTRODUCTION

Before the Court is the government's motion for a preliminary order of forfeiture against Defendants Paul Babichenko, Peter Babichenko, Tim Babichenko, and Mikhail Iyerusalimets.[1] Dkt. 1644. The Court conducted forfeiture hearings on January 24-26, 2023. The parties subsequently filed their proposed findings of fact and conclusions of law. The Court now enters its findings of fact, conclusions of law, and preliminary order of forfeiture.

---

[1] The motion also requests forfeiture from Defendant David Bibikov, which the Court will address in a separate order.

## BACKGROUND

This case's history is too extensive to recite in detail. In short, the defendants were indicted in August 2018 for conspiracy to commit wire fraud, conspiracy to traffic in counterfeit goods, labels, or packaging, conspiracy to launder money, and individual substantive counts of the same crimes. Dkt. 1. A superseding indictment followed in May 2019, which included additional charges and criminal forfeiture allegations. Dkt. 210.

In 2021, the case went to trial. At the close of the government's case, it dismissed the money laundering counts. The jury acquitted various defendants of some individual counts but could not reach a verdict as to most of the charges.

The case was retried in 2022. The defendants were found guilty of conspiring to traffic in counterfeit goods and commit wire and mail fraud as well as some individual substantive counts of the same crimes. Dkt. 1594, 1595, 1596, 1600. Based on those convictions, the government has moved for forfeiture of proceeds, facilitating property, and substitute assets. Dkt. 1644.

## LEGAL STANDARD

Criminal forfeiture is a mandatory part of punishment. 28 U.S.C. § 2461(c); *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir. 2005). "Criminal forfeiture operates *in personam* against a defendant to divest him of his title to proceeds from his unlawful activity as a consequence of his criminal conviction." *United States v.*

*Lazarenko*, 476 F.3d 642, 647 (9th Cir. 2007). Convicted defendants must forfeit "tainted property"—"property flowing from . . . or used in . . . the crime itself," which "the defendant himself actually acquired as the result of the crime." *Honeycutt v. United States*, 137 S. Ct. 1626, 1632, 1635 (2017). There is no joint and several liability in forfeiture. *Id.*

Federal Rule of Criminal Procedure 32.2 and 21 U.S.C. § 853 set out the standards and procedures for forfeiture. 18 U.S.C. § 2323(b)(2)(A); 28 U.S.C. § 2461(c); *Lazarenko*, 476 F.3d at 647. The government has the burden to show, by a preponderance of the evidence, that property is subject to forfeiture. *United States v. Garcia-Guizar*, 160 F.3d 511, 517 (9th Cir. 1998). That requires proof of a nexus between the property and the crime. *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1149 (9th Cir. 2011). The Court applies a "but for" test to nexus: the government must establish that the defendant would not have obtained the property but for his illegal activity. *United States v. Martin*, 2014 WL 221956, *4 (D. Idaho).

To determine nexus, the Court may rely on evidence admitted at trial as well as additional relevant and reliable evidence. Fed. R. Crim. P. 32.2(b)(1)(B). Because forfeiture is part of sentencing, the Court may consider evidence, including hearsay, "without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia

of reliability to support its probable accuracy." *United States v. Petty*, 982 F.2d 1365, 1367 (9th Cir. 1993) (quoting U.S.S.G. § 6A1.3(a)).

The Court must order forfeiture against a defendant convicted of wire or mail fraud. 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c). In these cases, forfeitable property includes "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" the fraud. *Id.* The statute provides for forfeiture of either gross or net proceeds, depending on the nature of the crime. The Court has already determined that gross proceeds are forfeitable in this case because the defendants were convicted of committing wire fraud by selling counterfeit goods. *Order*, Dkt. 1678 at 3-6. Consequently, forfeitable proceeds include "property of any kind obtained directly or indirectly, as the result of" conspiracy to commit wire fraud by selling counterfeit goods "and any property traceable thereto." 18 U.S.C. § 981(a)(2)(A).

The Court must also order forfeiture against a defendant convicted of trafficking in counterfeit materials. 18 U.S.C. § 2323(b)(1). In these cases, federal law permits forfeiture of "[a]ny property constituting or derived from any proceeds obtained directly or indirectly as a result of the commission of" the crime. 18 U.S.C. § 2323(a)(1). The Court has previously ruled that in the context of this statute, "proceeds" means gross proceeds. *Order*, Dkt. 1678 at 6-7.

The statute also provides for the forfeiture of "[a]ny property used, or

intended to be used, in any manner or part to commit or facilitate the commission

of" the counterfeit trafficking offense. 18 U.S.C. § 2323(a)(1). The statute's

language is staggeringly broad, demonstrating congressional intent for forfeiture in

criminal trademark and copyright cases to be extensive and punitive. Nevertheless,

the defendants argue the Court should define facilitating property by transplanting

the "substantial connection test"—which Congress devised for civil proceedings—

into 18 U.S.C. § 983(c)(3). The Court declines to do so. The Ninth Circuit has not

extended this test to criminal proceedings, much less the criminal intellectual

property forfeiture provision specifically. More importantly, Congress chose to set

out a wide-ranging standard rather than the substantial connection test.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[2]

### A.    Double Counting in the Government's Forfeiture Motion

1.    Pursuant to Rule 32.2(b), the government seeks a money judgment against

each defendant for the criminal proceeds he obtained, calculated from the

total amount of Amazon deposits that he received. Dkt. 1644.

2.    This option is clearly available to the government where, as here, the

proceeds of the criminal activity are money. *United States v. Newman,* 659

---

[2] The record in this case is extraordinarily vast. For ease of reference, the Court will refer to exhibits introduced in the second trial simply by exhibit number (e.g. Ex. 1000). When referring to exhibits introduced at other times, such in the first trial and forfeiture hearings, the Court will specify the proceeding (e.g. Trial 1, Ex. 1000).

F.3d 1235, 1242 (9th Cir. 2011). A money judgment is a proper form of criminal forfeiture. *Id.*

3.  But seeking money judgments is an election on the government's part. Under Rule 32.2(b)(1)(A), "the government may seek the forfeiture of specific property *or* the government may seek a money judgment." *Id.* (emphasis added).

4.  Because the government requests money judgments for criminal proceeds, the procedural and substantive requirements of Rule 32.2(e) do not apply to the requested money judgment orders. *See Newman*, 659 F.3d at 1242–43 (recognizing that the government seeking a money judgment under Rule 32.2(b) does not need to satisfy the requirements of substitute assets under § 853(p) and Rule 32.2(e)).

5.  However, the government seeks more than money judgments. It also asks the Court to forfeit facilitating property from each defendant in the form of business bank accounts and other assets. Moreover, the government requests forfeiture of property purchased with criminal proceeds from Tim and Paul. Finally, the government wants substitute assets under the provisions of 21 U.S.C. § 853(p) and Rule 32.2(e).

6.  Given the government's election to seek a money judgment, all three of these requests risk impermissible double counting.

7.     It is well established "double counting is flatly prohibited in the context of

criminal forfeiture." *United States v. Young*, 330 F. Supp. 3d 424, 435

(D.D.C. 2018) (citing numerous cases prohibiting double counting of

proceeds). "Courts have also cautioned against allowing the same funds or

property to be ordered forfeited multiple times under different forfeiture

provisions." *Id.*

8.     It is obvious that ordering both a money judgment for proceeds of a

defendant's criminal activity, and forfeiture of property purchased with

those proceeds would constitute impermissible double counting. Therefore,

absent evidence that the proceeds are distinct from one another, the Court

cannot order the forfeiture of property purchased with criminal proceeds

from Tim and Paul.

9.     The same specter of double counting shadows the government's request for

forfeiture of facilitating property. That property cannot have been acquired

with criminal proceeds that the Court has forfeited through a money

judgment.

10.    Therefore, the Court may only order forfeiture of such property if the

government establishes that it was not obtained using proceeds of the

defendant's criminal activity. To do otherwise would result in impermissible

double counting.

11.    The government has not offered any financial tracing to show that the defendants obtained the facilitating property with funds separate from the proceeds represented in the money judgment.

12.    For that reason, the Court will not order forfeiture of property that the government argues is forfeitable because it facilitated the crime.

13.    In addition, the government argues that the Court should find it has satisfied the requirements of 21 U.S.C. § 853(p) to seek substitute assets from the defendants. However, by their very nature, substitute assets are a replacement for criminal proceeds which the defendant has placed beyond the government's reach.

14.    Awarding a money judgment reflecting the proceeds the defendant obtained through his criminal activity *and* specific substitute assets would constitute impermissible double counting unless the government establishes the substitute assets are for proceeds not represented in the money judgment.

15.    The government has not made that showing here, so the Court will not order forfeiture of substitute assets. The government's motion for forfeiture of substitute assets from Paul Babichenko (Property Nos. 1.L, 1.M, 1.N, and

1.O) and Tim Babichenko (Property Nos. 3.M, 3.N, 1.H[3], and 1.I[3]) is denied.

16. Finally, to avoid any other double counting, the Court will also direct that each defendant's seized property, including real property and seized currency, be offset against the money judgment amount for that defendant.

## B. Establishing Proceeds of Counterfeit Goods for Money Judgments

### I. *Suppliers*

17. Trial evidence demonstrated that at least 93.1 percent of all the goods that Defendants Paul Babichenko, Tim Babichenko, Peter Babichenko, and Mikhail Iyerusalimets sold were counterfeit.

18. The Court reaches that conclusion by looking to the defendants' sources of product supply, rather than combing through thousands of Amazon sales. This approach is an efficient and effective method of assessing the nature of the goods sold.

19. The defendants secured products in a variety of ways. Several obtained products for themselves. Paul communicated with counterfeit suppliers to

---

[3] Trial evidence showed that law enforcement seized the Rolex watch and assorted diamond rings from Room F. Def. Forfeiture Ex. D1.H-1 at 4-5. It was undisputed throughout the trials that Room F was associated with Tim, and not Paul. *See* Trial 1 Exhibit. 2401A at 25-35 (photographs of Room F). Further, Paul makes no claim of these items and stated in his forfeiture hearing that they are not his. *See* Dkt. 1694 at 43 ("Property 1.H is a Rolex watch and 1.I is diamond rings. We are not making any argument about them. They weren't Paul Babichenko's property.").

arrange for purchases for himself, Peter, Tim, and Mikhail, as confirmed in chats, *see* Ex. 3005-65, and thousands of invoices seized from the warehouses, *see* Ex. 2403.

20. 93.1 percent of the goods sold came from only five suppliers: United Inform, Windigital, Sennex, Topphone, and Wiss Wireless. *See* Ex. 1263 (showing $19,132,076.90 sent to those suppliers and $1,424,464.27 sent to AT&T, BrightStar, and Verizon).

21. The trial evidence established that these five suppliers provided goods bearing counterfeit marks frequently used throughout the ten-year conspiracy.

   a. United Inform. *See* Ex. 1300; Ex. 2622; Exs. 3005-1–3005-67; Ex. 3006; Ex. 3020; Ex. 1263; Ex. 3020; Ex. 1263; Ex. 2601; Ex. 2401; Ex. 2403; Ex. 2467; Ex. 2479; Ex. 2820-24; Ex. 4176; Ex. 4227; Ex. 4239; Ex. 4252; Ex. 4261A; Ex. 4261B; Ex. 4702; Ex. 4703; Ex. 3604.

   b. Windigital. *See* Ex. 1263; Ex. 2008D; Ex. 3646; Ex. 3647; Ex. 3653; Exs. 3671-1–3671-20; Ex. 4092; Ex. 4102; Ex. 4120; Ex. 4231; Ex. 4242.

   c. Sennex. *See* Ex. 1263; Ex. 2403; Ex. 2442; Ex. 2479; Ex. 3604; Ex. 4098; Ex. 4161; Ex. 4193; Ex. 4421.

d.  Topphone. *See* Ex. 1263; Ex. 2434; Ex. 2442; Ex. 3604; Ex. 3655; Ex. 3656.

e.  Wiss Wireless. *See* Ex. 1263; Ex. 3019; Ex. 3025; Ex. 3040; Ex. 3088; Ex. 3654; Ex. 3661; Ex. 4264.

22.  Other trial evidence bolsters the conclusion that, at a minimum, 93.1 percent of the goods sold were counterfeit.

23.  For instance, brand representatives from Apple and Samsung testified that more than 90 percent of the items reviewed over the course of the years' long investigation bore counterfeit marks. *See, e.g.*, Trial 2 Tr. at 2787, 2803–04, 2999, 3003, 3007.

24.  Thousands of items seized from the Large Warehouse, chats, emails, employee testimony, and financial records likewise confirmed the counterfeit nature of the vast majority of these goods, labels, and packaging. *See* Trial 2 Tr. at 3145 (Pupko testifying that 90–95 percent of products came from Chinese suppliers, not auctions); *compare* Ex. 1263 (suppliers), *with* Ex. 1300 (Customs and Border Protection chart), *and* Ex. 3005-60 (Wallace United informing Paul that "[A]uction is not suitable for us").

25.  Of the thousands of items that the defendants sold, none had genuine packaging, genuine accessories, and genuine cellphones. *See* Def. Forfeiture Exs. D7.5F-D.7.5P (excel spreadsheets documenting Apple and Samsung's

authenticity determinations of defendants' products).

26.  For each sale, there was a counterfeit trademark on one or more of the following: the packaging, the ear buds, the charger, and the cellphone. *See* Ex. 5002; Ex. 5003; Ex. 5004A; Ex. 5005; Ex. 5006; Ex. 5008; Ex. 5009; Ex. 5010; Ex. 5100; Ex. 5205; Ex. 5201B; Exs. 5301–5350; Exs. 5404–5408; Ex. 5412; Ex. 5413A–C; Ex. 5415; Ex. 5416; Exs. 5419–5421; Ex. 5501; Exs. 5503–5513; Exs. 5601–5610.

27.  The chats between all defendants, their coconspirators, employees, and suppliers likewise underscored how counterfeiting fraud permeated their business during the course of the proven conspiracy. *See, e.g.*, Trial 2 Tr. at 3128.

28.  Altogether, this evidence leads the Court to conclude that at least 93.1 percent of all the goods sold were counterfeit.

## II.  *Product Mix*

29.  The defendants say the Court should look at evidence of sales—rather than supplier evidence—to determine the proportion of the goods that were counterfeit.

30.  They argue that the Court must consider that a portion of the product mix that was sold over the years included brands other than Apple and Samsung (the only brands that the government included in the Superseding

Indictment) and products accurately listed as used or refurbished.

31. To support this argument, they rely on the Declaration of Christopher Linscott. Def. Forfeiture Exs. D1.2A (Paul); Ex. A-2 (Peter); Ex. D3.10 (Tim); Ex. 5D.1 (Mikhail); Dkt. 1666-1. The Court finds the declaration meets the basic requirement of reliability and so will overrule the government's objection and admit the exhibit.

32. Mr. Linscott offered an opinion that an average of 14.3 percent of the goods sold were brands other than Apple and Samsung or accurately listed as used or refurbished. Mr. Linscott reached this determination by reviewing bank records, account documents, corporate records, revenue detail, and "other information." Dkt. 1666-1 at 2.

33. The Court finds this evidence less compelling than the evidence from suppliers, which is supported by the defendants' communications, emails, and invoices, as well as the testimony of the brand representatives and the physical evidence collected during the course of the investigation. Therefore, the Court will rely on the supplier evidence.

34. Still, the Court finds that the government has not met its burden to prove by a preponderance of the evidence that the other 6.9 percent of products sold were counterfeit.

35. The government argues that these sales perpetuated the scheme. It claims

that the defendants intentionally interspersed or separately sold non-counterfeit products simply as a ruse to facilitate the counterfeit scheme.

36. The government relies primarily on statements that Defendants Mikhail Iyerusalimets and David Bibikov made during one of the undercover purchases at the Small Warehouse. The Court has reviewed the cited exhibit. Ex. 2010A.

37. Although Mikhail does talk about the importance of being a "power seller" on Ebay, at no point does he actually say that one had to sell cheaper generics in order to fraudulently sell branded counterfeit items as "new" online. That is the government's inference. It is not supported.

38. A more reasonable interpretation of this exchange is that Mikhail was expressing his frustration because his accounts had been closed and he wanted them reopened. He informed the CI that to have accounts reopened, one had to first sell cheaper, generic items, to build a record up. He said nothing about using generics *as a ruse to sell counterfeit, branded items as "new."*

39. The Court concludes that the government's reliance on that snippet of a conversation is too thin a reed on which to base its entire theory. The evidence at trial showed that the products came in bulk, were quickly tested for basic functionality, and then were sold and sent to customers. There is

insufficient evidence from trial that employees intentionally included or sold separately genuine products to facilitate counterfeit sales.

40. The government did not establish a nexus as to the 6.9 percent of non-counterfeit products. Accordingly, the Court will reduce the total Amazon sales figure by 6.9 percent for each defendant.

### III. Duplicate Revenues

41. The government relied on Linda Czemerys's calculations to determine the amount of the money judgment sought against each defendant.

42. In his declaration, Mr. Linscott offers the opinion that Ms. Czemerys included the amount that Paul received from Peter, Tim, and Mikhail as Amazon deposits. Dkt. 1666-1 at 3. He says that "Linda Czemerys has double counted the same Amazon sales; first, in the bank account deposits for Mikhail, Tim, and Peter; and second when she also counts the transfers from those defendants to Paul Babichenko." *Id.*

43. The government has not offered any evidence in rebuttal. Trial evidence demonstrated other mistakes in Ms. Czemerys's calculations. *See* Trial 1 Tr. at 4990-92; Trial 2 Tr. at 2404.

44. As the proceeds passed through and ultimately went to Paul, the Court finds that it is more appropriate to charge the double counted amounts in forfeitable proceeds to Paul rather than Peter, Tim, and Mikhail.

45.     Accordingly, the Court will reduce the total Amazon sales figures attributed

to Peter, Tim, and Mikhail by the amounts that Mr. Linscott determined

were also ascribed to Paul, as further discussed below.

**C.    Paul Babichenko**

*I.    Money Judgment*

46.     Based on the financial records, Paul Babichenko received at least

$53,219,430 during the scope of the proven conspiracies. *See* Ex. 1250 at 5.

Of these total deposits, $36,206,982.10 were Amazon deposits Paul

personally received during the conspiracies proven at trial. *See id.*; Ex 1257;

Ex. 1256 at 5; *see also Government Brief*, Dkt. 1711 at 10-11 (summarizing

deposits).

47.     During trial, the Court heard testimony from Paul's employees. They

recounted operating selling accounts for him. They also described his

directives to transfer proceeds via cash, money orders, and checks to him,

his business, and his wife's personal bank account. *See, e.g*., Trial 2 Tr. at

4288, 4307–08. Text messages and bank records admitted at trial likewise

demonstrated this pattern. *See, e.g.*, Ex. 3221-12 (Paul directing David

Bibikov to "get[ ] money from amazon" and "count it up and bring cash");

D-2002 at 27 (showing summary of Amazon proceed transfers from

employees' accounts to Midstar LLC bank account 6620 and Natalie

Babichenko's 9602 account).

48. As a result, Paul must forfeit all Amazon deposits that he received for the sale of counterfeit goods.

49. As discussed above, the government has proven that 93.1 percent of the goods Paul sold were counterfeit. Therefore, 93.1 percent of the Amazon deposits represent proceeds of the crime that Paul personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

50. The Court will enter a money judgment in the amount of $33,708,700.30.

## II.    *Property Purchased with Proceeds*

51. The government claims that Paul used his criminal proceeds to pay for two vehicles: a 2016 Lexus LX570 (Property No. 1.F) and 2012 Jeep Wrangler (Property No. 1.G).

52. However, as noted above, the government may not seek a money judgment as a means of forfeiting the proceeds of Paul's criminal activity, and also request forfeiture of specific assets he acquired with offense proceeds. Doing so without financial tracing constitutes impermissible double counting.

53. Therefore, the government's motion to forfeit the vehicles (Property Nos. 1.F and 1.G) is denied.

54. Since they have been seized by the government, their value must be credited

toward the money judgment against Paul.

### III.    *Facilitating Property*

#### i.  *909 N. Cole Road*

55.    Under a facilitation theory, the government seeks to forfeit real property located at 909 N. Cole Rd., Boise, Idaho (Property No. 1.A), which is owned by Paul and Gennady's company Babichenko LLC. Since the money judgment reflects the forfeiture of offense proceeds, and does not reflect the forfeiture of facilitating property, the government may independently request forfeiture of the 909 N. Cole Road property. However, to avoid double counting, the government must prove that the facilitating property was not acquired using the offense proceeds covered by the money judgment.

56.    The government argues that the property facilitated the crime because Paul used the 909 N. Cole Rd. address for a few business documents.

57.    The address was listed on the Pacific Cellular Certificate of Organization with the Secretary of State, Ex. 1607 at 21, and a Pacific Cellular bank account that received $915,234.59 in Amazon direct deposits, Ex. 1256 at 7.

58.    Paul further listed 909 N. Cole Road as Midstar's address in direct email communication with Amazon to "prove the authenticity of the item" and "reinstate [his] listing because [he had] checked the items with the manufacture for authenticity." Ex. 4056 at 1.

59.     Finally, the address was listed for Midstar on fraudulent invoices created for

Cell2U4Less. Ex. 4054. Arthur Pupko testified that he and Paul both created

such invoices, and he did not know who had created those particular ones.

Trial 2 Tr. at 3286:25-3287:8. Pupko also testified that the business name

and address were already linked in the invoice software. Trial 1 Tr. at

4474:23-4475:23. He would pick the business he needed and the address

would automatically populate. *Id.* He did not change addresses. Trial 2 Tr. at

3289:7-12.

60.     The Court finds that the government has established the required nexus

between the 909 N. Cole Rd. property and the offense. Simply put, using the

property's address facilitated Pacific Cellular and Midstar's illegal business

activities. That is a sufficient nexus under the very permissive standard that

Congress established in 18 U.S.C. § 2323(a)(1).

61.     However, the government has not submitted any evidence about when or

how Paul purchased the property. Without evidence that the property was

*not* purchased with proceeds covered by the money judgment, the Court

cannot order forfeiture and risk double counting.

62.     The government's motion to forfeit 909 N. Cole Rd. property (Property No.

1.A) is denied.

ii.  *Sahara Case Bank Account*

63. The government seeks forfeiture of a bank account linked to Sahara case—Acct No. 8429-Mtn West (Property No. 1.D and Property No. 1.E).[4]

64. The government fails to establish a nexus between the seized funds and Paul's crime.

65. Sahara Case is a company selling cell phone cases separate from the offense-related businesses, as indicated by Peter's trial testimony (Trial 1 Tr. at 6092–6102, 6115-6120, 6172-6174; Trial 2 Tr. at 4771-4882), the Sahara Case website (Trial 1 Ex. 2802), the trademark and patent applications (Trial 1 Exs. 8351-8356; Trial 1, Exs. 8360-8368; Trial 1 Exs. 8369, 8370), and the trade show photograph (Trial 1 Ex. 8358).

66. No tracing of the seized Sahara Case funds connected those funds to the offenses of conviction. Rather, to support its facilitation theory, the government points to a single transaction—Peter's sale of three counterfeit "Qualcomm" chargers for $38.97.

67. The Court is not persuaded. This transaction had nothing to do with Paul (or Tim, *see* Part E.III). There is nothing showing the proceeds of that sale was deposited in the Sahara Case bank accounts. Even if, circumstantially, the

---

[4] Although the government's forfeiture motion labels the account as two separate properties with two different accounts, this is a clerical matter. There is ultimately one account with that single account number.

Court assumes the money was so deposited, this single less-than-$40

transaction does not sufficiently connect the forfeiture of $67,508.87 from

the Sahara Case bank account.

68.     The government's motion to forfeit the Sahara Case bank account funds

(Property Nos. 1.D and 1.E) is denied.

### iii.  Business Bank Accounts

69.     Paul operated numerous cellphone and cellphone accessory business bank

accounts as another means of obscuring his fraudulent conduct. *See, e.g.*, Ex.

1256 at 6 (Property No.1.C); *see* Ex. 1257 at 3–4, 6 (showing deposits into

Property No. 1.B). Notably, Power Moxie (Property No. 1.C) sold

counterfeit Samsung batteries, which were additionally marked with

Defendant Paul, Peter, and Tim's mark for "Power Moxie." *See, e.g.*, Trial

1, Ex. 2435 at 1; Ex. 1611 at 1 (showing Power Moxie LLC).

70.     Each of these business bank accounts was used to facilitate the criminal

scheme. As such, the Court finds that the funds seized from the following

accounts constitute forfeitable facilitating property:

    a.  Acct No. 6620-Mtn West (Property No. 1.B) ($396,321.39)

    b.  Acct No. 8410-Mtn West (Property No. 1.C) ($9,501.03)

71.     Again, however, the government has not offered any financial tracing to

show that Paul obtained the facilitating property with funds separate from

the proceeds represented in the money judgment.

72. For that reason, the government's motion to forfeit the business bank account funds (Property Nos. 1.B and 1.C) is denied.

**D. Peter Babichenko**

73. At the forfeiture hearing on January 24, 2023, Peter introduced Defendant's Forfeiture Exhibit A-1—a Declaration and attached exhibits from Denise McClure, a forensic accountant and certified fraud examiner. Ms. McClure's Declaration was previously filed with the Court on January 3, 2023. Dkt. 1663. The government objected, but the Court overrules that objection and admits the exhibit. The Court finds the declaration meets the basic requirement of reliability in this sentencing hearing.

### *I. Money Judgment*

74. Based on the financial records, Peter Babichenko received at least $7,737,573.94 during the scope of the proven conspiracies. *See* Ex. 1250 at 4. Of these total deposits, $4,361,502.34 were Amazon deposits that Peter personally received during the conspiracies proven at trial through his many cellphone businesses. *See id.*; Ex. 1255; Ex. 1506; Ex. 1606.

75. The Court finds that Peter Babichenko's entire cellphone businesses perpetuated the fraud on which he was convicted. The chats between Peter, his coconspirators, and his suppliers demonstrated the permeation of the

fraud throughout his business during the course of the proven conspiracy.

*See, e.g.*, Ex. 3671-02; Ex. 3208-2–3208-5; Ex. 3647; Ex. 3671-01, -02, -12, -16, -21; Ex. 3662. Peter instructed others as to how to avoid Amazon account shutdowns, Ex. 3208-2, and provided fraudulent explanations for other conspirators to use, *see* Ex. 3668.

76.   As a result, Peter must forfeit all Amazon deposits for the sale of counterfeit goods that he received.

77.   As discussed above, the government has established that 93.1 percent of the goods Peter sold were counterfeit. Therefore, 93.1 percent of these Amazon deposits represent proceeds of the crime that Peter personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

78.   In addition, Mr. Linscott determined that $798,793 of Peter's Amazon deposits were double counted as forfeitable proceeds from both Paul and Peter. Dkt. 1666-1 at 3. Peter's forfeiture will be reduced by that amount.

79.   The Court will enter a money judgment order against Peter Babichenko in the amount of $3,316,882.40.

## II.   *Business Bank Accounts*

80.   Peter operated numerous cellphone and cellphone accessory business bank accounts as another means of obscuring his fraudulent conduct. *See, e.g.*, Ex.

1255 at 2 (including Property Nos. 2.A, 2.B, 2.C, 2.D); Ex. 1506. Each of these business bank accounts was used to facilitate the criminal scheme.

    a.  Acct No. X4046-Mtn West (Property No. 2.A) ($100.00)

    b.  Acct No. X679-Mtn West (Property No. 2.B) ($1,565.21)

    c.  Acct No. X0660-Mtn West (Property No. 2.C) ($5.00)

    d.  Acct No. X3600-Mtn West (Property No. 2.D) ($302.37)

81.    The Court concludes that the government has proven a nexus between the accounts and Peter's criminal conduct. The funds seized from these accounts are facilitating property.

82.    But once again the government has not offered any financial tracing to show that Peter obtained the facilitating property with funds separate from the proceeds represented in the money judgment.

83.    For that reason, the government's motion to forfeit the business bank account funds (Property Nos. 2.A, 2.B, 2.C, and 2.D) is denied.

### E.    Tim Babichenko

#### I.    *Money Judgment*

84.    Based on the financial records, Tim Babichenko received at least $25,858,795.74 during the scope of the proven conspiracies. *See* Ex. 1250 at 2. Of these total deposits, $11,004,926.31 were Amazon deposits Tim personally received during the conspiracies proven at trial through his many

cellphone businesses. *See id.*; Ex. 1252; Ex. 1253; Ex. 1504; Ex. 1508; Ex. 1509; Ex. 1604.

85.    The Court finds that Tim's entire cellphone businesses perpetuated the fraud on which he was convicted. The chats and emails between Tim, his coconspirators, employees, and his suppliers established the permeation of the fraud throughout his business during the course of the proven conspiracy. *See, e.g.*, Ex. 2460 (fraudulent invoices); Ex. 3138 (email with supplier); Ex. 4143A (infringement letter); Ex. 4442 (customer complaint email).

86.    As a result, Tim must forfeit all Amazon deposits for the sale of counterfeit goods that he received.

87.    As noted, the government has proven that 93.1 percent of the goods Tim sold were counterfeit. Therefore, 93.1 percent of those Amazon deposits represent proceeds of the counterfeiting crime that Tim personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

88.    The Court further concludes based on Mr. Linscott's opinion that $1,090,644 are Paul's proceeds that were double counted against Tim. Dkt. 1666-1 at 3. The Court will deduct that amount from the total Amazon deposits.

89.    The Court will enter a money judgment in the amount of $9,230,196.82.

## II.    Property Purchased with Proceeds

90.    The government claims that Tim used his criminal proceeds to pay for 2015

Ford F-150 (Property No. 3.L) and real property at 2051 Three Lakes

(Property No. 3.K).

91.    However, as noted above, the government may not seek a money judgment

as a means of forfeiting the proceeds of Tim's criminal activity, and also

seek to forfeit specific assets he acquired with offense proceeds. Doing so

constitutes impermissible double counting.

92.    Therefore, the government's motion to forfeit the F-150 and the real

property (Property Nos. 3.L and 3.K) is denied.

## III.   Bank Accounts

93.    To facilitate his crime, Tim operated numerous cellphone business bank

accounts. Of the $25,858,795.74 deposited into his accounts, Tim transferred

millions among his many business and personal accounts, *see* Ex. 1252 at 8,

and received proceeds from his employees' sales (who functioned as so-

called "Six Percenters," *see id.* at 6). *Compare* Trial 1, Ex. 1220-2 (showing

major depositors into various business and personal accounts as Alex

Trofimuk, Denis Popudnik, Innessa Babichenko, Nikolay Bukhantsov,

Vadim Galushkin, and Sahara Case) *and* Ex. 1253 at 4, *with* Ex. 2466 at 2–

3; Ex. 4122 (Amazon shutdown email from Tim to Innessa Babichenko); Ex.

4501 (email listing Vahdim Galushkin as tester of phones employed by Tim); *see also* Ex. 2457 at 21–30 (checks from employees for phone sales proceeds).

94. Tim's business accounts received millions in Amazon direct deposits. *See, e.g.*, Ex. 1250 at 2 (showing Amazon deposits into business Account Nos. 3.B, 3.D–3.I held by Tim); Trial 1, Ex. 1291-3 (summary showing Amazon deposits by account).

95. In total, the government seized $517,135.99 in Tim's bank accounts. Of those accounts, the following constitute facilitating property because they are tied to companies that sold the counterfeit items:

    a. Acct. No. 1190-Amazon (Property No. 3.A) ($23.16)

    b. Account No. 4252-WA Fed (Property No. 3.D) ($980.73)

    c. Acct. No 7081-Mtn West (Property No. 3.E) ($6,799.44)

    d. Acct. 4260-WA Fed (Property No. 3.F) ($2,126.33)

    e. Acct. 8347-Mtn West (Property No. 3.G) ($149,108.49)

    f. Acct 4112-WA Fed (Property No. 3.H) ($82,704.31)

    g. Acct 8410-Mtn West $9,501.03 (Property No. 3.I)

96. In addition, the government seeks forfeiture of Wells Fargo account 5152 (Property No. 3.B) ($120,765.33). Although this is a personal account for Tim and Kristina Babichenko, it received $3,913.06 in Amazon deposits

between 2016-2018. Ex 1252. That meets 18 U.S.C. § 2323(a)(1)'s broad facilitation definition. Accordingly, the account constitutes facilitating property.

97.    But, again,  the government has not offered any financial tracing to establish that Tim obtained this facilitating property with funds separate from the proceeds represented in the money judgment.

98.    For that reason, the government's motion to forfeit the business bank account funds (Property Nos. 3.A, 3.D, 3.E, 3.F, 3.G, 3.H, and 3.I) is denied.

99.    The government's motion to forfeit Wells Fargo account 2293 (Property No. 3.C) is also denied. This is not facilitating property. It is a personal account of Tim and Kristina. The government has not shown that this account received Amazon deposits or facilitated Tim's crime in a different way. The government fails to prove nexus.

100.   Finally, the government's motion to forfeit Mountain West account 8429 (Property No. 3.J) is denied. This account is tied to Sahara Case. As explained above, the Court finds that the government has not met its burden to show that Sahara Case facilitated the crime. *See* Part C.III.ii. Because the government fails to prove a nexus between Sahara Case and criminal activity, the motion is denied.

## IV.    *Stipulated Forfeiture*

101. Pursuant to the parties' stipulation (Dkt. 1708), the Court forfeits Western Digital hard drive bearing serial number WXA1E944SJ3J as containing illegal contraband and herein orders that the government destroy this hard drive.

### F.    Mikhail Iyerusalimets

102. Mikhail Iyerusalimets and his wife Anna (younger sister to Paul, Peter, and Tim Babichenko) each operated online businesses in the secondary phone market. Ex. 1501, 1502.

103. Anna was actively involved in the online businesses and operated several that generated income exclusively in her name. *See, e.g.*, Ex. 1501.

104. Mikhail did the same.

105. In 2018, Anna and Mikhail were both indicted in this case. A jury convicted Mikhail of wire fraud, mail fraud, trafficking in counterfeit goods, and conspiring to do the same. The jury acquitted Anna of all charges.

### I.    *Separating Mikhail's Proceeds*

106. The Court finds that Mikhail's entire cellphone businesses perpetuated the fraud on which he was convicted: the communications between Mikhail, his coconspirators, employees, seizures, and his suppliers established the permeation of the fraud throughout his business during the course of the proven conspiracy. *See, e.g.*, Exs. 1319–21; Ex. 1400; Ex. 1509; Ex. 1602;

Ex. 2818-1–2818-18; Ex. 3205; Ex. 3216-08; Ex. 3511; Ex. 3514; Ex. 3516.

107. As a result, Mikhail must forfeit all Amazon deposits for the sale of counterfeit goods that he received.

108. The government seeks a money judgment against Mikhail for proceeds from Amazon businesses that belonged to him.

109. Mobile Rack, LLC, Electro Metro, Advantage Wireless, LCC, Cellaris LLC, Simplified Selling, LLC, and one account for Mountain Wireless Distributing (Washington Federal Bank 7900) were linked to bank accounts solely in Mikhail's name. Ex. 1251-3. The total Amazon deposits for businesses *solely* in Mikhail's name is $1,196,165.51. Ex. 1251-6.

110. To the extent those proceeds were from the sale of counterfeit goods, they are forfeitable.

### i. *Anna's Proceeds*

111. The government also seeks to include proceeds from Amazon businesses that belonged to Anna in the money judgment against Mikhail.

   a. Star-KS, LLC, Droid Masterz, LLC, and AIMEO, LLC were linked to bank accounts solely in Anna's name. Ex. 1251-3.

   b. Star KS received $97,305.74 in Amazon deposits. Ex. 1251-6.

   c. Droid Masterz received $288,126.78 in Amazon deposits. Ex. 1251-6.

   d. AIMEO received $6,431.06 in Amazon deposits. Ex. 1251-6.

e.  The total Amazon deposits for businesses *solely* in Anna's name is $391,863.58.

112.  The government does not explain why Mikhail should forfeit proceeds generated by Anna's business activities. At best, it offers the statement that the deposits "represent proceeds of the crime Mikhail controlled and received, either directly through bank accounts he held or *those he controlled indirectly through his wife, Anna*." Dkt. 1711 at ¶ 59 (emphasis added).

113.  The government has not met its burden to prove that Mikhail must forfeit proceeds that Anna generated and received into bank accounts that were solely in her name. The government's argument is conclusory and flies in the face of the evidence and argument that it offered at trial of Anna's heavy involvement in business activities. There is simply not a preponderance of evidence that Mikhail controlled proceeds indirectly through Anna.

114.  Under *Honeycutt,* 137 S. Ct. at 1632, 1635, Mikhail is responsible only for his own ill-gotten gains. There is no joint and several liability for co-conspirators. Without a nexus between Anna's proceeds and Mikhail's criminal conduct, they are not forfeitable.

115.  Moreover, because the jury acquitted Anna of all charges, her businesses' proceeds are not "tainted" property. It is "clean" property. As such, it is non-

forfeitable.

116. Consequently, the Court will not include the $391,863.58 in proceeds from Anna's businesses in Mikhail's money judgment.

### ii. *Joint Proceeds with Anna*

117. The government further asks to include the proceeds from Amazon businesses that Mikhail shared with Anna in his money judgment.

    a. Cell Zone, LLC and Mountain Wireless Distributing (Mountain West Bank 7872) were linked to bank accounts jointly held by Anna and Mikhail. Ex. 1251-2.

    b. Cell Zone received $1,590,345.41 in Amazon deposits. Ex. 1251-6.

    c. Mountain Wireless received $392,753.31 in Amazon deposits. Ex. 1251-6.

    d. The total Amazon Deposits for businesses *shared jointly* by Anna and Mikhail is $1,983,098.72. Ex. 1251-6.

118. The government has failed to prove a nexus between Mikhail's criminal activity and the entire proceeds generated by the businesses that he and Anna owned jointly.

119. Mikhail undoubtably exercised control of the businesses. Money was transferred from his business, Cubic Wireless, to Cell Zone. *See* Ex. 1041, Ex. 1046 at 13. He submitted insurance documents, Ex. 2607 and tax

records, Ex. 2610. He said in texts with Tim that he was "stressed out" and "scared" about Cell Zone getting shut down. Ex. 3216-07. Product invoices listed "Mike" as associated with "Cellphone Zone." *See* Ex. 3506. Mikhail used the Cell Zone email to communicate with his employee. Trial 2 Tr. at 3727:9-16. Of the 20 checks written to the employee, 19 were signed by Mikhail and one was signed by Anna. Trial 2 Tr. at 4274:3-13; Ex. 1025 at 1-2; Trial 2 Tr. at 1164:17-1165:9.

120. That said, at trial the government argued that Cell Zone was linked to Anna. *See, e.g.* Ex. 1501. In fact, the jury saw an exhibit that linked Cell Zone's $1,861,159.72 in proceeds solely to Anna. *Compare id. with* Exhibit 1502 (listing Mikhail's Amazon records, which do not include Cell Zone); *See also* Ex. D-1600 (listing Cell Zone only under Anna but listing Mountain Wireless under both Mikhail and Anna).

121. Trial evidence showed that Anna also exercised control of the businesses. Agent Akers testified that he associated Cell Zone with Anna through bank records and her communications with the Idaho Department of Labor. Trial 2 Tr. at 1167:14-22. In fact, when a Department of Labor employee contacted Anna in November 2015, she identified Cell Zone as a company that she and Mikhail had operated together for two years. Ex. 1003 at 2.

122. When Amazon shut Cell Zone down, Anna told Paul, "Im still trying to get

cellzone reopened lol . . . . . I wrote them everyday lol." Ex. 3557 at 11. In later messages, Peter asked "Anna[. ] Are you cellphone zone[?]". Ex 3208.03. Anna responded, "Yes it got reinstated?". *Id.* She then indicated that she and Mikhail would tell their employee to adjust a product price. *Id.* Peter and Anna repeatedly tussled over the prices she set on Cell Zone listings. Ex. 3208-4. She demonstrated a sophisticated knowledge of the businesses.

123.    Anna and her brothers apparently agreed that Mikhail was not a particularly good businessman. Trial 2 Tr. at 4846. In a text message, Anna told her brothers to ignore Mikhail because he "doesn't know anything" about the businesses, particularly the financial side of the businesses. Trial 2 Tr. at 3895-96; Ex. 3205 at 2.

124.    In short, trial evidence demonstrated that Anna and Mikhail were both heavily involved in operating their joint businesses. But under *Honeycutt*, Mikhail is liable only for the property that he "himself actually acquired as a result of the crime" and not "property obtained by his [acquitted] co-conspirator." 137 S.Ct. at 1635.

125.    Because the government failed to demonstrate a nexus between Mikhail's criminal conduct and the full amount of the jointly held Mountain Wireless and Cell Zone account proceeds, a portion of the proceeds must be excluded

as generated at least partially from Anna's activities.

126.   The Court need not calculate Anna's participation with numerical precision. She was deeply involved in all business activities. The Court finds it appropriate to deduct one-half of the proceeds from these jointly held businesses as attributable to Anna's activities, for a total of $991,549.36.

127.   Accordingly, between the businesses held exclusively in Anna's name and the jointly held businesses, the Court concludes that $1,383,412.94 of the Amazon deposits are proceeds attributable to Anna's activity and, therefore, are not forfeitable criminally through Mikhail.

### iii.   *Double Counted Proceeds*

128.   The Court further concludes based on Mr. Linscott's opinion that another $1,639,584 are Paul's proceeds that were double counted against Mikhail. Dkt. 1666-1 at 3. The Court will not include that amount.

129.   Also, at some point, Peter transferred one of his businesses, Rubiks Cube, LLC, to Mikhail. The government is seeking forfeitable proceeds from both Mikhail and Peter for Rubiks Cube for at least some of the same years. Ex. 1251-6; Ex. 1255-3. For Mikhail the government claims $612,444.74 in Amazon deposits for Rubiks Cube as forfeitable. Ex. 1251-6. Some portion of that amount must be excluded as proceeds attributable to Peter. The Court concludes that it is appropriate to exclude from Mikhail's total the

$136,502.62 that the government seeks from Peter from this same account. *See* Ex. 1255-5.

130. That leaves $1,024,072.99 of proceeds from the Amazon deposits attributable solely to Mikhail's conduct.[5]

131. As discussed above, the government has shown that 93.1 percent of the goods Mikhail sold were counterfeit. Therefore, 93.1 percent of those Amazon deposits represent proceeds of the crime that Mikhail personally received in his various business accounts and, thus, are forfeitable as a money judgment order.

132. The Court will enter a money judgment order against Mikhail Iyerusalimets in the amount of $953,411.95.

## II. *Specific Property*

133. To facilitate his crime, Mikhail operated numerous cellphone and cellphone accessory business bank accounts. *See* Ex. 1251 at 3 (including Property Nos. 5.B, 5.C, and 5.D). Each of these business bank accounts was used to facilitate the criminal scheme:

     a. Acct No. 2418-Mtn West (Property No. 5.B) ($38.52)

---

[5] $4,183,572.55 (total deposits) less $391,863.58 (Anna's sole proceeds) less $991,549.36 (Anna's shared proceeds) less $1,639,584 (Paul's proceeds) less $136,502.62 (Peter's proceeds from Rubiks Cube) equals $1,024,072.99

b. Acct No. 7900-WA Fed (Property No. 5.C) ($27,237.76)

c. Acct No. 6274-Mtn West (Property No. 5.D.) ($43,985.55)

134. As such, the Court concludes that these accounts are facilitating property.

135. Mikhail used a 2010 Land Rover (Property No. 5.A) to facilitate the crimes by delivering packages containing counterfeit goods, packaging, and labels. *See* Ex. 2002B (surveillance photographs of Mikhail dropping off counterfeit products purchased undercover by agents). That is sufficient to satisfy the broad facilitating standard in the counterfeit trafficking forfeiture provisions.

136. But the government has not offered any financial tracing to establish that Mikhail obtained the facilitating property with funds separate from the proceeds represented in the money judgment.

137. For that reason, the government's motion to forfeit the business bank account funds and the 2010 Land Rover (Property Nos. 5.A, 5.B, 5.C, and 5.D) is denied.

## G. Contraband

138. From the Small Warehouse, agents seized nine pallets of counterfeit goods, which totaled to 13,416 separate items. *See* Trial 2 Tr. at 2021; Ex. 2501.

139. In the Large Warehouse, agents seized fifty-one pallets, totaling 90,357 separate items, which included 8,399 empty Apple iPhone packages and

18,768 empty Samsung packages. *See, e.g.*, Exs. 2401, 2402.

140. Pursuant to the expanded provisions of the intellectual property provisions, these 103,773 items seized and packaged onto sixty pallets are forfeitable contraband. *See* Trial 2 Tr. at 645–46; *see also* 18 U.S.C. § 2323(a)(1)(A) ("Any article, the making or trafficking of which is, prohibited under section 506 of title 17, or section 2318, 2319A, 2319B, or 2320, or chapter 90, of this title").

## H. Eighth Amendment

141. The Eighth Amendment prohibits the imposition of "excessive fines." U.S. CONST. AMEND. VIII. The Constitution thus "limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *United States v. Bajakajian*, 524 U.S. 321, 328 (1998) (quotation and citation omitted).

142. Forfeitures are fines subject to Eighth Amendment scrutiny if they constitute punishment for an offense. *Id*.

143. "[A] punitive forfeiture violates the Excessive Fines Clause if it is grossly disproportional to the gravity of the defendant's offense." *Id*. at 334.

144. The Court considers "four factors when weighing the gravity of an offense: (1) the nature and extent of the crime, (2) whether the violation was related to other illegal activities, (3) the other penalties that may be imposed for the

violation, and (4) the extent of the harm caused." *United States v. Beecroft*, 825 F.3d 991, 1000 (9th Cir. 2016) (citation and quotation omitted).

145.   The defendants were convicted of operating a ten-year, sophisticated scheme. They participated in a massive conspiracy to import hundreds of thousands of counterfeit trademarked goods, repackage them, and sell them online.

146.   They defrauded thousands of unsuspecting consumers.

147.   They stole valuable intellectual property from trademark owners, who enjoy an exclusive right to prohibit others from trafficking in the spurious versions of goods and services bearing their marks. *Matal v. Tam*, 137 S. Ct. 1744, 1751 (2017); *see also* 18 U.S.C. § 2320.

148.   To facilitate this scheme, the defendants solicited the help of unsuspecting young members of their community who operated numerous online businesses and tested products. *See, e.g.*, Ex. D-2002 at 4 (chart of employees).

149.   In short, the defendants' crimes were extensive and grave.

150.   There is no indication that the crimes were connected to other illegal activities. To the contrary, although the government initially charged the defendants with money laundering, the government dismissed those charges after the close of its case at the first trial.

151. "In considering an offense's gravity, the other penalties that the Legislature has authorized are certainly relevant evidence, as are the maximum penalties that could have been imposed under the Sentencing Guidelines." *United States v. 132,245.00 in United States Currency*, 764 F.3d 1055, 1059-60 (9th Cir. 2014) (quotations and citations omitted). "[T]he maximum penalties under the Sentencing Guidelines should be given greater weight than the statutory maximum because the Guidelines take into account the specific culpability of the offender." *Id.*

152. For a first offense of trafficking in counterfeit goods, the statutory maximum term of imprisonment is 10 years and the maximum fine is $2,000,000. 18 U.S.C. § 2320(b)(1)

153. For a mail and wire fraud offense, the statutory maximum term of imprisonment is 20 years and the maximum fine is $250,000. 18 U.S.C. §§ 1343, 1341, 1349.

154. The U.S. Probation Office calculated the guideline range for the defendants as 188-235 months for Paul, 108-135 months for Peter, 135-168 months for Tim, and 97-121 months for Mikhail. Both the government and the defense have pending objections to the guideline ranges.

155. Again, both the maximum penalties and the anticipated guideline ranges underscore the severity of the defendants' criminal conduct. By prescribing

such severe penalties, Congress clearly indicated its view that these crimes constitute significant harm.

156. The Court recognizes that the money judgments alone far exceed the maximum fine for mail and wire fraud and exceed (except for Mikhail) the maximum for counterfeit trafficking.

   a. Paul's judgment of $33,708,700.30 is almost 17 times the $2,000,000 maximum penalty for counterfeit trafficking.

   b. Peter's judgment of $4,060,558.68 is around 1.6 times the maximum penalty.

   c. Tim's judgment of $9,230,196.82 is about 6.5 times the maximum fine.

157. Although these penalties are undoubtably severe, the disparity is warranted because it corresponds to the injuries sustained by the trademark holders and the defrauded consumers over a decade.

158. The defendants argue that the actual benefit they received should inform the Court's assessment of the severity of the offense. Seventy-four percent of their proceeds went to cover the costs of goods sold and shipping costs. Dkt 1666-1 at 13. Once operating expenses were paid for, the defendants earned about a 9 percent profit on the Amazon sales. *Id.*

159. The Court is not persuaded by this argument. The Eighth Amendment is

concerned with the proportionality between the offense and the fine.

160. That the defendants committed the offense in a manner that left them with a low profit margin does not factor into that proportionality. *See United States v. Abhijit Prasad*, 18 F.4th 313, 322 (9th Cir. 2021) ("A criminal forfeiture that simply divests a defendant of the profits from his crime has little deterrent value."). As the old adage goes, "crime doesn't pay."

161. In light of the seriousness of the offense, the penalties imposed, and extent of harm caused, the money judgment amounts are constitutionally proportional to the crimes of conviction.

## ORDER

1. The government's motion for preliminary order of forfeiture (Dkt. 1644) is GRANTED IN PART.

2. The Court will grant the government the following money judgments:

   a. A judgment of $33,708,700.30 against Paul Babichenko

   b. A judgment of $3,316,882.40 against Peter Babichenko

   c. A judgment of $9,230,196.82 against Tim Babichenko

   d. A judgment of $953,411.95 against Mikhail Iyerusalimets

3. The government's motion for forfeiture is DENIED in all other respects.



DATED: March 15, 2023

B. Lynn Winmill
U.S. District Court Judge