Barry L. Flegenheimer
Washington State Bar No. 11024
Bell Flegenheimer
119 First Avenue South, Suite 500, Seattle, WA 98104
(206) 621-8777
barrylfp@gmail.com

John C. DeFranco
Idaho State Bar No. 4953
Ellsworth, Kallas & DeFranco, PLLC
1031 E. Park Blvd., Boise, ID 83712
(208) 336-1843
jcd@greyhawklaw.com

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO,<br>DAVID BIBIKOV,<br>MIKHAIL IYERUSALIMETS,<br><br>Defendants. | CASE NO. CR-18-00258-BLW<br><br>DEFENDANTS' RESPONSE RE RESTITUTION |

## I.    Introduction

The government requests $15,887,176.50 in restitution on behalf of Apple, Inc.

("Apple"); Samsung Electronics Co., Ltd. and Samsung Electronics America, Inc.

("Samsung"); and UL LLC ("UL"). *See* Dkt. 1834. With respect to both Apple and

Samsung, the government claims that every time a defendant sold a counterfeit product,

the brands lost the gross profit from a corresponding sale. Thus, the government

calculated the restitution award by multiplying the total number of the Defendants'[1] sales by the gross profit, which Samsung and Apple allegedly would have earned if they had sold the same product. According to UL, each Customs and Border Patrol ("CBP") seizure represented a lost opportunity for UL to certify the product's design and manufacture, apparently inferring that the overseas suppliers were the Defendants' manufacturing factories. UL alleges it is entitled to $1,707,500 for those lost certification fees and because the Defendants placed consumers at risk, harmed its reputation, and because restitution is an important deterrent to prevent further victimization.

However, the purpose of the Mandatory Victims Restitution Act ("MVRA") is to recompense victims for the harm caused by the crime. To establish the victims' actual loss, the government bears the burden to provide a sufficient evidentiary basis, which allows the Court to find that the Defendants directly and proximately caused the victims to lose the claimed amount of restitution.

Here, the government presented no evidence that the Defendants' sales diverted corresponding sales of Samsung and Apple's genuine product, presented no evidence of net profit such as avoidable costs, and made no effort to connect the considerable causation gap between UL's opportunity to certify manufacture in unidentified factories and the Defendants' patronage of overseas suppliers who shipped counterfeit products. Nor is UL entitled to restitution for any harm, which the Defendants purportedly caused their customers, or to deter future misconduct.

---

[1] This response is filed on behalf of Paul Babichenko, Piotr Babichenko, Timofey Babichenko, Mikhail Iyerusalimets, and David Bibikov (the "Defendants").

Accordingly, the Court should decline to order any restitution. If the Court awards some amount of restitution, it should apportion that award equitably among the Defendants.

The Court should also refuse to award restitution to Samsung and UL for investigation and prosecution costs because the government has failed to justify the costs claimed.

## II.    Argument

### A.    The Court should not award restitution for Apple and Samsung's purported lost sales because those losses are entirely speculative and do not account for avoidable losses.

The MVRA requires the Court to "order a defendant to make restitution to a victim of certain specified offenses," including victims of trafficking in counterfeit goods. 18 U.S.C. § 3663A; *see also United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013). The MVRA's goal is to restore the victim and, therefore, any award is limited to the victim's "actual losses," which were the direct and proximate result of the defendant's offense. *United States v. Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016); *Anderson*, 741 F.3d at 951; *United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1165–66 (9th Cir. 2010). Neither the defendant's ability to pay nor his ill-begotten gains measures the victim's loss. *Id*.

The government must prove the victim's actual loss by a preponderance of the evidence. *Anderson*, 741 F.3d at 951. To determine actual loss, the Court compares what actually happened with what would have happened if the defendant had acted lawfully. *United States v. Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010). In cases involving intellectual property infringement, the victim's actual loss is typically the victim's lost

profit from sales because customers purchased the defendant's goods while believing they were buying from the victim. *See, e.g.*, *Anderson*, 741 F.3d at 951 (citing *United States v. Fair*, 699 F.3d 508, 514 (D.C. Cir. 2012)).[2]

1.     **The government has not shown that Apple and Samsung lost any sales due to the Defendants' sale of infringing devices.**

With respect to both Apple and Samsung, the government's request is based on the assumption that each phone sold by the Defendants caused the brand to lose a corresponding sale of the same model. For instance, Apple asserts that the Defendants sold 9,409 counterfeit iPhone 4s and, thus, it necessarily lost the gross profit from 9,409 iPhone 4s sales. Dkt. 1834-1 at 2.

However, to prove lost profits based on diverted sales, the government must offer sufficient evidence to establish: (1) the profit margin per sale, *and* (2) the number of sales lost. If the record does not demonstrate that the counterfeit goods in fact "thwarted" actual sales of the victim's product, courts have held that no actual loss can be shown and restitution therefore is inappropriate. *Anderson*, 741 F.3d at 952 (citing *Fair*, 699 F.3d at 511–12). Evidence that customers purchased infringing copies at significant discounts, standing alone, does not establish that the customer would have purchased an authentic version at full price. *Anderson*, 741 F.3d at 953.

---

[2] As explained in the Declaration of Christpher Linscott ("Linscott Declaration"), Ex. 1, at 4-6, an infringing mark can cause the victim loss (1) if customers purchase the defendant's goods while believing they are buying from the victim; (2) if customers are disappointed in the quality of the infringing goods and lose loyalty to the brand; or (3) if the defendant's sale of infringing goods at less than the customary price causes the brand to lower its prices to maintain its customer base. *See id.* at 5 (citing 1 Fannon, N., & Dunitz, J. , The Comprehensive Guide to Economic Damage 532 (Business Valuation Resources, LLC, Fifth Edition, 2018). The government has alleged losses only related to the first of these points; the other two are not at issue.

Indeed, the Ninth Court has disavowed the proposition propounded by the government in this case, holding a victim's loss in a prosecution for intellectual property rights infringement cannot be calculated by simply referencing the quantity of infringing items. In *Anderson*, the defendant was charged with copyright infringement after selling Adobe software advertised as "full," "complete," or "OEM," but which he provided on consumer-grade "burned" discs with generic labels. The district court found that Adobe was the victim and calculated restitution by multiplying the number of copies sold by Adobe's retail price. *Anderson*, 741 F.3d at 950–51.

The *Anderson* Court discussed the D.C. Circuit's review of the caselaw in *Fair*, which also involved a defendant convicted of selling illegal copies of Adobe software:

> In cases involving copyright infringement and fraudulent sales, the victim's actual loss typically equates to the profit the victim lost on the sales that were diverted from the victim as a result of the defendant's infringing sales. Under this lost-profits on diverted-sales theory, the government must offer sufficient evidence to establish both the profit margin per sale and the number of sales lost. If the record does not demonstrate that the counterfeit goods ever reached the market, or that their introduction to the market in fact "thwarted" actual sales of the victim's product, courts have held that no actual loss can be shown and restitution therefore is inappropriate.

*Fair*, 699 F.3d at 514 (citations omitted); *see also Anderson*, 741 F.3d at 952.

*Anderson* also discussed *United States v. Chalupnik*, 514 F.3d 748 (8th Cir. 2008). There, the defendant took undeliverable CDs and DVDs originally sent by BMG and sold them to used record stores. The district court imposed restitution equal to the defendant's gross revenues. On appeal, the Eighth Circuit rejected district court's use of the defendant's "ill-gotten gains" as the measure for the victim's loss and noted that any calculation of lost sales or profits may not be "based entirely upon speculation." *Anderson*, 741 F.3d at 953 (citing *Chalupnik*, 514 F.3d at 754–55).

*Anderson* then held that:

> [C]onsistent with our own restitution precedents, as well as *Chalupnik* and *Fair*, . . . . restitution in a criminal copyright case must reflect the victim's actual losses, not the defendant's gain. In most cases, that will consist of the copyright owner's lost profits on sales that would have taken place if not for the infringing conduct.

741 F.3d at 953. The Court also emphasized: "the fact that a consumer purchased an infringing copy at a greatly reduced price is not sufficient, alone, to establish that the consumer would have purchased an authentic copy at full price. *Id.*; *see also Fair*, 699 F.3d at 514.

Here, the government focuses on only half the equation—the gross profit, which Apple and Samsung would have earned, *if* they had sold the products sold by the Defendants. However, courts should be "skeptical of the implicit suggestion" that evidence that customers purchased a certain number of copies of low-priced counterfeit software proves that those same customers would have agreed to purchase the same number of copies from the authorized seller for many times more. *Fair*, 699 F.3d at 515; *see also United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (expressing skepticism that a purchaser of discounted counterfeit software would be willing to purchase authentic software at full price).

The government offered *no* evidence to meet its burden on the second prong of the analysis by showing that each sale made by the Defendants diverted a comparable sale of the trademark holders' authentic product. What's more, the existing record contradicts Apple and Samsung's contention that the Defendants' sales diverted comparable sales of the same products. Neither Apple nor Samsung sold directly on Amazon during the relevant time period. It is undisputed that the Defendants sold Apple and Samsung phones two or more years after their release by the brands, at which point

those models were no longer available from Apple and Samsung. Ex. 6165 (admitted at trial 1); DM2-93 (presented at trial 2); 6/24/22 Trial Day 18, 3044:20–23 (Leah Caras confirming that the phones she examined for this case were "older model phones"); 7/21/21 Trial Day 17 (Leah Caras confirming that Apple discontinued the iPhone 5s and 6 in 2016); 7/27/21 Trial Day 19 (James Hogg answering affirmatively that the phones sold in this case were older models).

Moreover, as to the counterfeit phones at issue, as indicated by Derek Ellington's testimony, the Samsung and Apple phones were genuine but were refurbished with aftermarket parts. 7/25/22 Day 25, 4520. Thus, Samsung and Apple had *already* received the profit from selling any particular iPhone or Samsung Galaxy sold by the Defendants. And because the Defendants sold models at a time after Apple or Samsung directly sold those models as new, the Defendants' conduct could not have caused the brands to lose corresponding sales as alleged in the government's restitution request.

Instead, the pertinent question is the victims' financial position if the Defendants had not been selling counterfeit phones as new on Amazon. Would a customer who purchased an iPhone 4 from the Defendants at a discount two years after its release date instead leave the Amazon platform to seek out and buy a newer, and considerably more expensive, Apple and Samsung device available at the time? Or would the customer shopping for a discounted, older phone purchase a refurbished phone instead? Or perhaps, a "new" iPhone 4 from another Third-Party Seller? Or a cheaper phone such as a Motorola? At least one customer presented by the government, Mr. Teders, was specifically seeking older models to test software and was not interested in purchasing

the latest and greatest model. *See* 6/17/22 Trial Day 15, 2433:8–10, 2433:14–15, 2466:8–9.

The government failed to frame its restitution request in terms of the probable circumstances, which would have occurred but for the Defendants' crimes. Rather, by relying exclusively on the Defendants' sales volume, the government has provided no "evidentiary basis on which the district court could find that had" the Defendants not sold counterfeit phones at "a greatly reduced price, all or any portion of" those customers would have purchased newer models at several times the cost. *Anderson*, 741 at 952; *see also Fair*, 699 F.3d at 516; *Hudson*, 483 F.3d at 710.

The government failed to meet its burden to prove that the Defendants' sales diverted customers from Apple and Samsung. Nor should the Court try to fill in the government's evidentiary blanks. In the event the actual-loss calculation is too complex, the MVRA envisions the appropriate path for a district court is to decline to order restitution at all, not to issue an order unsupported by the evidence. *See Fair*, 699 F.3d at 516. The government declined to support its request, notwithstanding the additional time allowed after sentencing, and the Court should thus decline to order restitution in this case.

        **2.**       **Even if Apple and Samsung lost sales as a result of the Defendants' conduct, the restitution request fails to account for avoidable losses and therefore incorrectly requests gross, not actual net, loss.**

To qualify as "actual" loss compensable by the MVRA, any profit that the trademark holders lost from diverted sales must reflect *net*, rather than gross, profit. *United States v. Beydoun*, 469 F.3d 102, 108 (5th Cir. 2006) ("Because the purpose of the MVRA is to compensate a victim for its losses, the appropriate measure in this

commercial setting is lost net profit."). "This is necessarily a backward-looking inquiry that takes into account what actually happened, *including whether the victim managed to recover some or all of the value it originally lost.*" *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) (emphasis added).

Further, the requested award must be a precise and provable calculation. In *Anderson*, the Ninth Circuit empathized with the district court's sentiment in attempting to estimate a victim's lost profit, but held:

> [T]he MVRA requires more precision. A 'back-of-the-envelope' approach simply will not do. *See United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir. 2008) (remanding to the district court to reconsider several possible errors in its 'rough approximation' of the victim's losses). Consequently, on this basis alone, the district court's loss calculation was erroneous.

*Anderson*, 741 F.3d at 953.

As discussed in Section A above, Samsung and Apple failed to provide any evidence whatsoever establishing that the Defendants' actions deprived them of a single sale. *See also* Ex. 1, Linscott Declaration at 3-4. But even assuming the trademark holders lost some sales, they provided insufficient proof of actual, net losses.

Samsung's two-page restitution request is devoid of any evidence that it considered avoidable costs. Dkt. 1834-2, *see also* Ex. 1, Linscott Declaration at 8. Similarly, while Apple revealed a bit more of the "back of the envelope" calculations underlying its claimed lost profit, it also failed to account for avoidable costs. Dkt. 1834-1, *see also* Ex. 1, Linscott Declaration at 7–8.

> **3.  In their restitution requests, neither Apple nor Samsung account for or consider offsets for monies earned from having the phones the defendants sold being placed in the companies' markets.**

Aside from avoidable costs, neither Apple nor Samsung's calculations account for offsets for monies the companies earned as a result of the phones the defendant's sold and placed in companies' markets. As the Defendants noted in their sentencing memoranda, several notable market analysts have posited that the real profit for smart phone companies comes not from the sale of hardware, but from having new customers use the operating systems and make purchases of applications that run on the hardware, such as games, music, and other entertainment.

As one analyst observed:

> Device makers don't lose out completely when older phones pass through several hands: For Apple, more iPhone users from the price-conscious crowd translates into more revenue for its fast-growing services arm, including the App Store and its music and payment services.[3]

Neither company has accounted for the contributions Defendants' activities likely made to their bottom lines in the form of new users purchasing software and, in turn, new hardware from the trademark holders. *See, e.g.*, Dkt. 1764, Ex. 31 (Declaration of Rich Helfrich).

Similarly, neither trademark holder accounts for the profits attributable to Defendants' support of trade-in possibilities. The robust market for Apple and Samsung trade-in promotions—wherein consumers turn in their used smart phones in exchange for a discount on the latest model smart phone—has long been supported by the refurbished smart phone market. "Services like early upgrade plans offered by mobile carriers and

---

[3]Martin, Timothy W. and Drew FitzGerald, "Your Love of Your Old Smartphone Is A Problem for Apple and Samsung," *The Wall Street Journal*, February 28, 2018 (last visited January 26, 2023, at https://www.wsj.com/articles/your-love-of-your-old-smartphone-is-a-problem-for-apple-and-samsung-1519822801).

Apple's iPhone Upgrade Program are resulting in a stream of gently-used, year-old iPhones being turned in by customers."[4] This refurbished market in turn:

> . . . allows Apple to reach customers who may not otherwise be in the company's traditional target market. While [refurbished phones] aren't included in Apple's revenue, the company does benefit if sales are to new users. Apple is able to sell services and additional hardware to these new users over time. This cycle becomes that much more impactful assuming an iPhone ends up being passed on to three or four owners over its lifetime. . . .[5]

*See also* Dkt. 1764, Ex.31, at 2–5 (Helfrich Declaration); Dkt. 1764, Ex.32, at 3 (Howell Declaration).

A victim seeking restitution must account for such offsets to their losses. *United States v. Randall Lee Rahal*, No. 2:08-cr-0566 TLN, 2015 U.S. Dist. LEXIS 148436, at *35–36 (E.D. Cal. Nov. 1, 2015) (declining to order restitution and stating: "Frito-Lay's restitution request for this amount fails to address whether it may have offset any loss from higher costs through other means, for example by raising its prices charged to its own customers."); *see also Gamma Tech Industries, Inc.*, 265 F.3d 917, 926 (9th Cir. 2001) ("The district court recognized that, if Pac Ship had been able to pass on to Navy the inflated charges from Gamma Tech and Tidelands when negotiating the price of the modifications, Pac Ship would have suffered no loss.").

Apple and Samsung brought forward no evidence of costs they avoided by the lost opportunities allegedly caused by the Defendants' activities. Similarly, neither company accounted for offsets due to monies they actually earned due to the

---

[4] Cybart, Neil, "The Gray Market's Impact on iPhone Pricing," *Above Avalon*, October 22, 2018 (last visited on January 26, 2023, at https://www.aboveavalon.com/notes/2018/10/22/the-gray-markets-impact-on-iphone-pricing).
[5] *Id.*

Defendants' conduct. The government failed its burden to prove that Apple and Samsung suffered actual loss as claimed in their requests.

**B.** **The Court should decline to award restitution to UL for unquantified harm and testing fees because the government has not shown that UL suffered any loss as a result of the Defendants' conduct.**

While UL has provided the lengthiest restitution request, it contains even less substance or evidence of actual, provable loss compensable under MVRA than the request of the two victims named in the indictment, Apple and Samsung. Instead, UL seeks unquantified restitution because the Defendants allegedly placed customers' safety at risk by selling products with counterfeit certification marks, the Defendants may have harmed its reputation, and "restitution is an important deterrent to prevent further victimization." Dkt. 1834-3 at 2–8, 11–12. UL also lists estimated certification fees it may have earned if it had certified the design and manufacture of the devices, batteries, or chargers that were shipped to the Defendants by overseas suppliers and seized by CBP. Without explaining how the Defendants' patronage of counterfeit suppliers caused some unidentified manufacturing factory or factories to forgo certification on multiple occasions, UL claims it actually lost at least $1,707,500 in certification fees as a direct and proximate result of Defendants' online sales. UL's non-economic claims are not cognizable under the MVRA and it cannot show the Defendants caused UL to lose factory certification fees when they purchased inventory from counterfeit cell phone suppliers.

### 1. Unquantified Harm

UL's restitution request details the importance of its certification services and alleges the Defendants' conduct harmed consumers and placed them at risk. However,

restitution should make the victim whole by restoring the value of the losses suffered as a result of the defendant's crime. *United States v. Thomsen*, 830 F.3d 1049, 1065 (9th Cir. 2016); *United States v. Crandall*, 525 F.3d 907, 916 (9th Cir. 2008). The MVRA defines the term "victim" as a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern. 18 U.S.C. § 3663A(a)(2). Under that standard, UL has no standing to collect restitution on behalf of consumers.

The government could have sought restitution on behalf of any customers who suffered economic loss due to Defendants' sale of products with counterfeit UL marks, such as medical bills or lost time from work. But there are no such victims — almost none surfaced after an online press release solicited victims who had purchased from the Defendants. Ex. 2 and 3, (DOJ press release and letter). After telling the jury about the huge volume of business conducted by the Defendants, the government presented three sets of disappointed customers and only one described any injury, and that injury required no medical attention when an adapter smoked.

Even if the Defendants conduct placed customers at risk, UL produced no evidence that it suffered actual loss as a result. Nor has UL provided a basis to find that the Defendants' conduct presented a *measurable* harm to its reputation.

Finally, UL's claim that restitution is an important deterrent to prevent further victimization completely misconstrues restitution's function. The "purpose of restitution" under the MVRA is not to punish the defendant, but to restore the victim. *United States v.*

*Hunter*, 618 F.3d 1062, 1064 (9th Cir. 2010). The majority of UL's comments could have been properly considered as a victim impact statement and, indeed, the document echos the statements of the UL representative who testified at sentencing hearings.

Restitution is not punishment and UL is not entitled to compensation for harm the Defendants allegedly caused to customers. Instead, UL can only be compensated for any actual loss that was directly and proximately caused by the Defendants' criminal conduct. Because there is no such loss in this case, the Court should deny the request.

### 2.    Testing Fees

UL also claims the Defendants caused it to lose testing fees that factories would have paid if they sought certification of the product. Thus, UL claims lost fees for each shipment that CBP seized where the product included a UL mark. UL's claim is entirely speculative and unfounded and, therefore, the Court should decline to award restitution. UL's testing fee claim appears to require multiple contradicted or unsupported inferences.

First, UL simply assumes that *the Defendants* were the ones refurbishing these devices and counterfeiting the UL mark. Dkt. 1834-3 at 9 ("UL Solutions has been directly and proximately harmed by *the defendants' counterfeiting* of UL's Marks. First, UL Solutions has lost income from *the defendants' failure* to have UL Solutions test and certify *their* products . . . .") (emphasis added). That is indisputably not the case. The Defendants did not have any role in refurbishing or manufacturing the devices, but were mere downstream purchasers. Their purchase of counterfeit devices simply has no bearing on *the manufacturers'* failure to obtain UL certification, and so they cannot be held accountable for restitution related to testing and certification fees.

Second, the Court would have to assume that each supplier was also a manufacturer. However, there is no evidence that any of the phones were manufactured by those suppliers. At most, it could be inferred that those companies refurbished fully manufactured phones with counterfeit parts such as backplates and screens. While there was evidence that counterfeit adapters and batteries were manufactured from whole cloth, there is no evidence that the listed suppliers were the manufacturers rather than distributors.

Third, even if the listed companies manufactured phones and/or accessories, there is no evidence to support the inference that the Defendants' patronage caused the companies to continue to sell counterfeits instead of obtaining UL certification. By way of analogy, a single customer who is willing to purchase from an unlicensed liquor store could not be the proximate or direct cause of the store's decision to forgo licensing fees. Instead, even if the single customer was a raging alcoholic, the store would likely need others in its customer base to continue doing business. Nor could the customer be held responsible for licensing based on each purchase. Yet the government claims UL could have had the opportunity to certify a United Inform factory each time Defendants purchased 70 iPhone 4s. Dkt. 1834-3 at 17. But United Inform, one of those most "prolific counterfeiters" according to the government, certainly would have sold more than 70 iPhone 4s listed on UL's exhibit. And in the event United Inform had sought UL certification for any manufacturing, that certification cost would have been spread among all the iPhone 4s, not just the fraction of its inventory which Defendants purchased.

If an actual-loss calculation is in fact too complex to permit a calculation of reasonable restitution, the MVRA envisions that the Court decline to order restitution at

all, rather than issue an order unsupported by the evidence. *See Fair*, 699 F.3d at 516

(citing 18 U.S.C. §§ 3663A(c)(3), 3664(d)). The government has failed to produce

sufficient evidence to show UL suffered any actual, provable loss, and the Court should

decline to order restitution.

> **C.     The Court should refuse to award restitution to Samsung and UL for investigation and prosecution costs because the government has failed to justify the costs claimed.**

The government submits Samsung and UL are entitled to recoup costs associated

with the investigation and prosecution of the case, and request that Samsung and UL be

awarded $281,332.37 and $154,188.91, respectively. Dkt. 1834 at 6–7. (Emphasis

added). To be sure, Samsung and UL incurred some reimbursable costs. However, the

submissions from Samsung and UL wholly fail to justify the costs claimed.

According to 18 U.S.C § 3663A(b)(4), restitution is appropriate: "in any case, [to]

reimburse the victim for lost income and necessary child care, transportation, and *other*

*expenses incurred during participation in the investigation or prosecution of the offense*

*or attendance at proceedings related to the offense.*" (Emphasis added). For costs and

fees to qualify under § 3663A(b)(4), the costs and fees must be "reasonably necessary" to

aid in the investigation or prosecution. *United States v. Eyraud,* 809 F.3d 462, 467–468

(9th Cir. 2015). Moreover, the MVRA does not cover the costs incurred by a company

for its own purposes apart from the government's investigation and prosecution. *Lagos v.*

*United States*, 138 S. Ct. 1684, 1690 (2018). Restitution awards are also limited to actual

*participation* in the investigation and prosecution. *United States v. Papagno*, 639 F.3d

1093, 1100 (D.C. Cir. 2011) (excluding restitution for internal investigation not required

or requested by the criminal investigators or prosecutors); *see also United States v. Yu Xue*, 2021 U.S Dist. LEXIS 11543 (E.D. Pa. June 15 2021).

For the reason discussed below, the Samsung and UL submissions, Dkt. 1834-2 and 3, fail to satisfy the government's burden of establishing the restitution awards requested.

### 1. Samsung's Request for $281,322.37.

In support of its claim to recoup attorney's fees and costs, counsel for Samsung, Sideman Bancroft, provide a half-page table that claims to supply a "breakdown of fees and costs." Dkt. 1834-2, Ex. A. The table simply provides the total hours, rates, and years of thirteen different "timekeepers" [6] from the Sideman Bancroft law firm and two lines totaling the costs. *Id.* This amorphous table is wholly insufficient for the Court to determine, as required, what fees and costs were "reasonably necessary" in support of the investigation and prosecution of this case. As Mr. Linscott discussed, Samsung failed to provide any supporting invoices from Sideman Bancroft supporting the claim. Ex. 1, Linscott Declaration at 10. Specifically missing is the following:

(1) A breakdown of the specific services provided.

(2) Dates the legal services were provided.

(3) The work provided by each "timekeeper."

(4) The name of the "timekeepers" and their position with the law firm.

(5) The "timekeepers" experience and skill level to support the rates being claimed.

(6) A breakdown of the costs.

---

[6] Interestingly, in its chart, Sideman Bancroft chose to label its staff as "timekeepers" while providing absolutely no "timekeeping" records.

Without any detail, there is no way for the Court to determine whether the legal fees and costs were unnecessary, excessive, or redundant. Certainly, in other civil litigation contexts, courts commonly have to evaluate parties 'claims for awards of attorney's fees to determine what fees are reasonable.[7] Under any measure, Sideman Bancroft's summary chart entirely fails to provide any information the Court may review to determine reasonableness of the claimed fees and costs.

In addition, without a breakdown of the specific services rendered, the Court lacks necessary information to determine whether the services rendered were requested by the government for Samsung's participation in the investigation and prosecution or whether it was for separate purposes. From the evidence presented at trials, Samsung used Sideman Bancroft to issue cease and desist letters. It is not apparent the issuances of these letters were at federal law enforcement's request. Rather, it appears, the purpose was to aid Samsung's attempt to stop the Defendants' importation of products apart from the government's investigation and prosecution. In other words, the purpose of these cease-and-desist letters were likely for Samsung's own business, civil and/or investigative purposes. If so, the associated fees for the investigation and production of these letters should not be included in a restitution award. From Sideman Bancroft documentation in the summary chart, it is impossible for the Court to determine whether the fees incurred were necessary for this investigation and prosecution or for Samsung's separate civil purposes. *Lagos*, 138 S. Ct. at 1290.

---

[7] Courts have set forth standards for determining reasonable attorney fees awards: *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) (enunciating twelve factors to be considered in calculating a fee award) and *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167–168 (3d Cir. 1973) (setting forth a two-step "lodestar test" for calculating reasonable attorney's fees).

## 2. UL's claim for $154,188.91.

UL's claim for recoupment of fees and costs are inconsistent with its claim for lost profits. In its submission, UL argues there is no real difference between its "net" and "gross" profits because "100% of the lost $1,707,500 in test fees as net income" is because the costs of staffing it already has on hand. Dkt. 1834-3 at 10. Thus, UL claims, due to already existing staffing, the full lost testing fees they would have charged are compensable without any avoidable cost reduction. UL takes the diametrically opposite position with respect to its claim for the recoupment of costs supporting the investigation and prosecution. In Sanjana Sharma's declaration, Dkt. 1834-3, Ex. B, he outlines the time spent by UL's existing staff on participating in the investigation and prosecution. Largely, UL nowhere identifies additional costs it incurred, outside its existing staffing costs, which they were already paying, to participate in this case.

Mr. Linscott discusses the problems with UL's claim for costs as follows:

The costs claimed by UL for internal time spent by existing employees is also unsupported. In addition, the rates used to ascribe a damage to the internal time do not appear to be consistent with the actual pay rates for these individuals. The claim for costs associated with internal time is also inconsistent with the avoidable cost theory advocated by UL in their calculation of lost profits. Under the lost profits calculation used by UL, no incremental time was calculated as a reduction of lost profits and UL appears to be stating that employees could have absorbed the additional work. Conversely, UL appears to be stating that the employees supporting the criminal investigation and prosecution could not have absorbed additional time within their schedules and therefore there was an extra cost. This seems disingenuous.

Ex. 1, Linscott Declaration at 10–11.

Because the costs claimed for participating in the investigation and prosecution did not result in additional costs incurred by UL, restitution for these "costs" should not be ordered.

In addition, UL claims $34,148.91 in fees for outside counsel, Greenberg Traurig, without providing supporting invoices. Dkt. 1834-3 at 37–38. As discussed regarding Samsung claim for such fees and costs, without supporting invoices, documenting details about the specific services provided, it is impossible for the Court to determine whether these fees are reasonably necessary for UL to participate in the investigation and prosecution. In his declaration, Mr. Sharma offers that the invoices can be provided. *Id.* at 38. Without invoices or full documentation detailing the legal services, the government cannot sustain its burden of establishing UL's recoupment of attorney's fees are justifiable.

**D.** **The Court should decline to order restitution because the burden of additional proceedings on the sentencing process to determine complex facts outweighs the victims' need for restitution**

After nearly five years that included considerable pre-trial litigation, two lengthy jury trials, and forfeiture and sentencing proceedings for these five Defendants, the government declined to use the time afforded by the Court after sentencing to present evidence of Samsung, UL, and Apple's actual loss. The government's burden under the statute and established precedent is unambiguous and neither Apple, Samsung, nor UL be remediless if the Court declines to award restitution as contemplated by the MVRA when determining a victim's losses would unduly complicate or prolong the process. The trademark holders can petition the government under the Money Laundering and Asset Protection Section ("MLARS") to assign forfeited proceeds to compensate them for their alleged loss. The Court should deny the government's requested restitution and decline to afford it an additional opportunity to prove the victims' losses in ways that would allow this Court to order restitution in conformance with the MVRA.

The MVRA does not apply "if the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(3)(B); *see also Anderson*, 741 F.3d at 954 (noting that the MVRA permits neither speculation nor rough justice and if the government does not prove a quantifiable amount of actual loss suffered by the victim with any degree of certainty, no restitution should be ordered).

In crafting this exception to the MVRA's restitution requirement, Congress "hoped to avoid creating a system that would, essentially, turn sentencing hearings into complicated, prolonged trials of the normal civil variety." *United States v. Gordon*, 393 F.3d 1044, 1060 (9th Cir. 2004) (Fernandez, J., concurring and dissenting); *see also Fair*, 699 F.3d at 515 (noting the MVRA's purpose differed from civil remedies and "the cases on which the government relies are inapposite civil law cases" that did not involve restitution awards in which the damage award was "statutorily limited to the victim's actual, provable loss"); *United States v. Kones*, 77 F.3d 66, 69 (3rd Cir. 1996) ("it was expected that entitlement to restitution could be readily determined by the sentencing judge based upon the evidence he had heard during the trial of the criminal case or learned in the course of determining whether to accept a plea and what an appropriate sentence would be"); S. Rep. No. 104-179, at 19 (1996), reprinted in 1996 U.S.C.C.A.N. 924, 931–32 ("In all cases, it is the committee's intent that highly complex issues related to the cause or amount of a victim's loss not be resolved under the provisions of mandatory restitution. The committee believes that losses in which the

amount of the victim's losses are speculative, or in which the victim's loss is not clearly causally linked to the offense, should not be subject to mandatory restitution.").

Similar to this case, the *Fair* Court declined to remand the vacated restitution order because "the legal and factual positions regarding" the MVRA's requirements were fully aired in the district court. *Fair*, 699 F.3d at 517. The Court was "unpersuaded that the government should be permitted 'a second bite at the apple'" to offer new evidence of Adobe Systems' actual loss unless it could show special circumstances. *Fair*, 699 F.3d at 517 (citing *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir.1995)).

The Court then found no special circumstances existed because the "government's burden to prove actual loss under the MVRA was well-established before sentencing, it was allowed to present evidence, and caselaw that "addressed the requirements of the MVRA's plain text prior" to the defendant's sentencing. *Fair*, 699 F.3d at 518. Conversely, in *Anderson*, the Court remanded the restitution issue because the district court had the benefit of neither its nor the *Fair* decision. *Anderson*, 741 F.3d at 954. The government in this case has no such excuse.

Nor would declining to award restitution leave Apple, Samsung, and UL without a remedy. Although "a defendant has no right to a credit against a restitution order equal to any part of the amount forfeited . . . , the Government may choose to assign forfeited proceeds to victims . . . ." *United States v. Carter*, 742 F.3d 440, 446 (9th Cir. 2014).

Thus, the trademark holders may file petitions for remission with the Department of Justice's MLARS. Remission is a process whereby,

> in a . . . criminal forfeiture proceeding, the Department solicits, considers, and rules on petitions for payment. The petitions can be submitted by, among other petitioners, victims. The federal regulations governing the remission of civil or criminal forfeiture are found at 28 C.F.R. Part 9.

U.S. Dept. of Justice, Criminal Division, Money Laundering and Asset Recovery Section,

Asset Forfeiture Policy Manual 2023, Chapter 14: Forfeiture and Compensation for

Victims of Crime, 14-1 (2023). The remission

> authority exists for virtually all offenses for which the government obtains a
> related administrative declaration of forfeiture, or civil or criminal forfeiture
> order. *See* 21 U.S.C. § 853(i)(1); 18 U.S.C. § 982(b)(1), which extends those
> procedures to most other criminal offenses).

*Id*. Once assets have been judicially forfeited, MLARS has the authority to distribute

them to victims. *See* 28 U.S.C. § 524(c)(1)(E)(i); 18 U.S.C. § 981(d); 21 U.S.C. §

853(j)(1), incorporated by reference in 18 U.S.C. § 982(b)(1); 21 U.S.C. 881; 28 C.F.R. §

9.

Rather than prolong proceedings in this Court to litigate actual, specific, and

concrete losses for the three trademark holders' provable losses, avoidable costs, and

offsets contrary to Congress's intent, the better remedy is for the trademark holders to

petition MLARS for remission.

E.    **The Court should apportion any restitution award equitably among the Defendants.**

Under the MVRA, a court retains the discretion in a case where more than one

defendant contributed to a victim's loss to "apportion liability among the defendants to

reflect the level of contribution to the victim's loss and economic circumstances of each

defendant." 18 U.S.C. § 3664(h).

The government asks the Court to impose joint and several liability on all

Defendants for the full amount of restitution. Dkt. 1834 at 8. But perhaps recognizing that

its request is inequitable, it gives the Court a route to apportionment based on each

Defendant's percentage of the total Amazon deposits. *See id*. at 8 n. 2. Under that view,

Pavel Babichenko would owe 64% of the total; Tim Babichenko—18%; Piotr Babichenko 7%; David Bibikov—9%; and Mikhail Iyerusalimets—2%. *Id*. The government does not provide an estimated proportion for Artur Pupko, to whom the MVRA's mandatory provisions also apply.

Though courts have no discretion to order restitution to crime victims, courts retain the flexibility to make that obligation equitable when several defendants took part—to a greater or lesser degree—in the loss. This case strongly warrants apportionment. Each of the convicted Defendants stands on a different footing as to culpability, economic gain, and current financial circumstances. The Court is well aware of those facts outlining that some Defendants were more deeply involved in the online business, made more money, for a longer period, and retained greater financial resources than others.

The Court need not apportion the debt with mathematical purity. Instead, in the event the Court determines any restitution award is appropriate, it should provide the parties an opportunity to be heard on the appropriate division of whatever final restitution obligation the Court orders.

## III. Conclusion

The Defendants respectfully request that the Court decline to award restitution or, if it finds an award is appropriate, that it apportion the award equitably among the Defendants.

DATED: May 12, 2023.

s/ Barry Flegenheimer
s/ John DeFranco
Attorneys for Pavel Babichenko

CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023 I filed the foregoing electronically through the CM/ECF system, which caused the parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Katherine L. Horwitz
Christian S. Nafzger
Joshua D. Hurwit
Justin D. Whatcott
Assistant United States Attorneys
Office of the United States Attorney
1290 West Myrtle Street, Suite 500
Boise, ID 83702
Kate.Horwitz@usdoj.gov
Christian.Nafzger@usdoj.gov
Joshua.hurwit@usdoj.gov
Justin.whatcott@usdoj.gov

Paul E. Riggins
380 South 4th Street, Ste. 104
Boise, ID 83702
rigginslaw@gmail.com

Mike French
BARTLETT & FRENCH PLLP
1002 W. Franklin St.
Boise, Idaho 83702
mike@bartlettfrench.com
*Attorneys for Piotr Babichenko*

Rob S. Lewis
913 W. River Street, Ste. 430
Boise, ID 83702
office@roblewislaw.com

Greg S. Silvey
P.O. Box 5501
Boise, ID 83705
greg@idahoappeals.com
*Attorneys for Timofey Babichenko*

Robyn A. Fyffe
P.O. Box 5681
Boise, ID 83705
robyn@fyffelaw.com

Brian Pugh
Assistant Federal Public Defender
Las Vegas, Nevada
Brian_Pugh@fd.org
*Attorneys for David Bibikov*

Ellen Nichole Smith
P.O. Box 140857
Garden City, ID 83714
ellen@smithhorras.com

Craig Durham
223 N. 6th Street, Suite 325
Boise, ID 83702
chd@fergusondurham.com
*Attorneys for Mikhail Iyerusalimets*

/s/ Melisa Wong