JOSHUA D. HURWIT
UNITED STATES ATTORNEY
KATHERINE L. HORWITZ, OKLAHOMA STATE BAR NO. 30110
CHRISTIAN S. NAFZGER, IDAHO STATE BAR NO. 6286
JUSTIN WHATCOTT, IDAHO STATE BAR NO. 6444
WILLIAM M. HUMPHRIES, IDAHO STATE BAR NO. 11709
ASSISTANT UNITED STATES ATTORNEYS
1290 W. MYRTLE STREET, SUITE 500
BOISE, IDAHO 83702
TELEPHONE: (208) 334-1211
FACSIMILE: (208) 334-1413

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>PAVEL BABICHENKO,<br>PIOTR BABICHENKO,<br>TIMOFEY BABICHENKO,<br>DAVID BIBIKOV,<br>MIKHAIL IYERUSALIMETS,<br><br>    Defendants. | Case No. 1:18-cr-00258-BLW<br><br>**UNITED STATES' REPLY TO DEFENDANTS' RESPONSE MEMORANDUM IN SUPPORT OF RESTITUTION** |

      During their operation of a decade-long criminal conspiracy to traffic in counterfeit goods, Defendants caused millions of dollars in loss to the companies who owned the genuine marks.  Each intellectual property rights holder was harmed as a result of Defendants' criminal conduct through the lost profits and fees caused by the sale of infringing goods to consumers, as well as by incurring costs to support this criminal investigation and prosecution.  The victims are entitled to recovery of the full amount of loss as a result of Defendants' criminal conduct.

I. **The record proves that Apple and Samsung lost substantial sales and profits because of Defendants' criminal scheme.**

   A. **Lost Sales**

The extensive factual record in this case, including the facts developed at trial, is more than sufficient to support a finding of sales diverted away from genuine Apple and Samsung products. Defendants' scheme involved online sales of purportedly genuine and new Apple iPhones and Samsung Galaxy cellphones and batteries and chargers to consumers who were in the market for products matching this description. From this factual record, the Court can reasonably find that, but for Defendants' illegal sales, the consumers duped by Defendants would have purchased genuine and new Apple and Samsung products, thereby diverting profits from Apple and Samsung.

Defendants rely heavily on the Ninth Circuit's *Anderson* decision to argue that sales of counterfeit products to consumers do not support inferences that those consumers would otherwise have purchased genuine products. But *Anderson* and similar cases dealt with crimes where the circumstances of the counterfeit sales were so different from authentic sales as to demonstrate *two entirely separate markets existed*—one for counterfeit products and one for genuine ones. In those situations, courts have been unable to infer diverted sales. *See United States v. Anderson*, 741 F.3d 938, 951 (9th Cir. 2013) (sales of counterfeit software occurred at only 26% of the retail price of the genuine product); *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (expressing skepticism that purchases of counterfeit software at 27% of the price for the genuine product were sufficient to show sales had been diverted from the victim); *United States v. Hucks*, No. 11-326, 2013 WL 654397 (E.D. Pa. 2013)

(denying restitution where counterfeit prescription pills were sold at less than 25% of retail price and sold "at flea markets and bars and on the streets" to buyers who lacked prescriptions), *aff'd*, 557 F. App'x 183 (3d Cir. 2014). By contrast, the circumstances of Defendants' counterfeit sales in this case can only lead to a conclusion that Defendants were selling in a single market for genuine Apple and Samsung products, and thereby causing Apple and Samsung losses.

As made clear during trial, Defendants' customers communicated time and again that they wanted genuine Apple and Samsung products and were reassured by Defendants that the products were genuine. Multiple consumers testified during trial that they wanted to buy authentic Apple and Samsung products. For example, Mr. Teders explained that he wanted a new, genuine iPhone and paid $500 dollars for a phone he ultimately purchased through Defendants' scheme. *See* Trial Tr. Day 15, 2432:04–:14. This evidence proves the consumer-victims' underlying desire for a genuine, new product—a desire further reflected in *thousands of customer emails* collected over the course of the investigation.

In those emails, customers asked Defendants whether the phones and accessories were genuine: "I want to make sure you don't sell counterfeit phones. Are you selling new, real Samsung Galaxy S6 Active phones?" Restitution Ex. 4, at 2. Consumers communicated their desire to purchase new and genuine products, and they returned the products that were found out as fake. Many consumers complained of the poor quality of the cellphones and accessories. *See, e.g.*, *id.* at 9 ("One of the main reason I bought Iphone is that charge will last longer. I am having issues with the charge of this Iphone 5s (I purchased from you for last 3 months. It's only 4 months since I bought. It shows 100%

when its plugged. After I unplugged, it suddenly drops to 1% within 15 minutes."). The overwhelming evidence demonstrates the consumers' desire to purchase both new and genuine Apple and Samsung products.

Ignoring this evidence, the verdict, and this Court's prior findings, Defendants yet again claim their products were "genuine" and claim the victim-brands benefited from their criminal counterfeiting scheme. *See* ECF 1839, at 7 ("[A]s to the counterfeit phones at issue, as indicated by [defense expert] Derek Ellington's testimony, the Samsung and Apple phones were genuine but were refurbished with aftermarket parts."). The Court's and the jury's rejection of this defense theory, however, forecloses any assertion by Defendants that their products were in fact genuine Apple and Samsung products. *See* Verdicts, ECF 1594–96; 1598; 1560; Order, ECF 1858 ¶¶ 17–25 (holding that 93.1% of products were counterfeit).

The facts established during trial—and further emphasized in the submitted restitution exhibits—prove that Defendants' consumers wanted to purchase new, genuine Apple and Samsung products, were deceived through Defendants' lies, and were ultimately convinced by Defendants to purchase counterfeit Apple and Samsung products. *See, e.g.*, Restitution Ex. 4 (collection of customer emails that were not introduced during trial*); see also* Trial Exs. 1502–09; Trial Ex. 1400; Trial Ex. 2505A; Trial Ex. 2601; Trial Ex. 2401; Trial Ex. 3216.26; Trial Ex. 2816.23; Trial Ex. 2816.25; Trial Ex. 3005.34; Trial Ex. 3221-117; Trial Ex. 3374; Trial Ex. 4017; Trial Ex. 4094. This record more than satisfies the requirements for restitution of lost profits through diverted sales.

It also distinguishes those cases relied upon by the defense. *See* ECF 1839, at 8 (asserting that "by *relying exclusively on the Defendants' sales volume*, the government has provided no 'evidentiary basis on which the district court could find that had' the Defendants not sold counterfeit phones as 'a greatly reduced price, all or any portion of' those customers would have purchased newer models at several times the cost." (emphasis added) (citing *Anderson*, 741 F.3d at 952; and *United States v. Fair*, 699 F.3d 508, 516 (D.C. Cir. 2012); *Hudson*, 483 F.3d at 710).

Unlike the facts in *Anderson*, *Fair*, and *Hudson*, the record here proved consumers were seeking out genuine products of the victim-brands but were diverted by Defendants' deception. *See Anderson*, 741 F.3d at 953 (reversing restitution award based on criminal proceeds to the defendant because the government failed to offer any proof of the victim-copyright holder's lost sales of genuine copyrighted software); *Fair*, 699 F.3d at 511 (reversing award of restitution based on defendant's gains and noting that "the government offered no evidence of either the number of sales that Adobe Systems likely lost as a result of Fair's scheme or the profit that Adobe Systems would have made on any such diverted sales."); *Hudson*, 483 F.3d at 710 (finding no basis for award of lost profits when defendant's customer refused to pay for the counterfeit software, turned over copies to the federal investigators, and the government provided "no support for its contention that Defendant's actions thwarted [any] theoretical future sale"); *see also United States v. Chalupnik*, 514 F.3d 748, 751, 754 (8th Cir. 2008) (noting that the "government introduced no additional evidence relating to [the retailer-victim's] actual loss" other than the defendant's gain from his criminal endeavors and refusing to award restitution on "this barren record").

Likewise, the restitution calculation here is based solely on sales to actual consumers. *See, e.g.*, Exs. 1502–09. This calculation does not include the more than 100,000 items discovered in the Small and Large Warehouses on August 22, 2018 during the execution of the search warrants. *See, e.g.*, Ex. 2402 (photographs of the thousands of seized counterfeit goods collected by law enforcement). Accordingly, the tally of diverted sales relied upon by the victim-brands includes only those goods placed into the market. *Compare Beydoun*, 469 F.3d at 107–08 (reversing award based on possession of products not introduced into the market). When, as here, a developed record demonstrates the diversion of sales from trademark holders, restitution in the amount of lost profits from those sales should be awarded to compensate the victim. *See United States v. Milstein*, 481 F.3d 132, 136–37 (2d Cir. 2007) (awarding restitution for lost profits to trademark holder under prior statutory scheme).

### B. Calculation of Profits

Apple and Samsung properly evaluated the profits lost from sales diverted by Defendants' crimes as sales revenue reduced by cost of goods sold. To support this restitution claim, each brand proffered affidavits that are sufficient to establish the loss.

#### 1. Profit Analysis

Defendants' crimes caused Apple and Samsung lost profits as measured by the gross profit by product, which accounts for the costs of goods sold (also known as "cost of sales") associated with that product. This analysis results in the most accurate estimation of profits lost by Apple and Samsung.

As this Court well knows, restitution is a case-specific analysis of the victim's loss in that particular case. As applied to intellectual property crimes, this analysis requires a determination of lost profit based on the particular "commercial setting" in that case. *See Beydoun*, 469 F.3d at 107–08. Here, both parties agree that an evaluation of the lost profits requires reducing the sales revenue by the cost of goods sold.

Gross profit by product is the correct measure of loss in this commercial setting. A gross profit margin begins with the sale price of the particular product (e.g., cellphone) and deducts the costs of goods sold. A gross-profit analysis accounts for costs that vary based on the volume of sales (known as "variable costs"). These variable costs include, for example, materials required to manufacture cellphones (e.g., screens, components, packaging, etc.) that come with the product. Under this analysis, therefore, the variable costs are deducted from the revenue generated by product sales. Both Apple and Samsung employed this approach in reaching their lost profit estimation.

Defendants agree that the proper method of calculating lost profits here requires reducing the sales revenue by the cost of goods sold. *See* ECF 1839-1, at 8 ("The measure of lost profits for Apple should include the sales price less the costs of goods sold . . . ."). Defendants argue, however, that Apple has failed to include "avoidable costs" in its determination of the lost profits. *See id.* ("However, the calculation of lost profits does not include any component for avoidable costs, which should further reduce lost profits."). This statement reflects confusion on the part Mr. Christopher Linscott, Defendants' financial expert. Apple and Samsung did deduct "avoidable costs" from the revenue generated by product sales.

**United States' Reply
in Support of Motion for Restitution—7**

While unclear, Defendants seem to ask this Court to measure lost profit as operating profit. *See* ECF 1839-1, at 7–8 ("For Apple, these avoidable costs (sic) could include salaries, utilities, space costs, costs related to selling and other administrative costs.").

Operating profit accounts for the costs of running the larger corporation, such as maintaining a physical office, staff salaries, research and development, and marketing. These costs, unlike materials contained within costs of goods sold, do not vary based on each additional cellphone sold. Here, Defendants' sales of counterfeit goods had no effect on Apple's and Samsung's operating costs, such as legal, marketing, or administrative expenses. These operating costs would have been incurred regardless of the lost sales caused by Defendants' crimes. *See* ECF 1839-1, at 7–8 ("For Apple, these avoidable costs (sic) could include salaries, utilities, space costs, costs related to selling and other administrative costs."). Defendants fail to explain why this Court should use operating profit to measure restitution.

Finally, Defendants appear to be arguing that Apple and Samsung—victims of Defendants' counterfeiting scheme—benefitted from Defendants' crimes because the counterfeit phones sold by Defendants nonetheless generated payments to Apple and Samsung when consumers used their services on the counterfeit cellphones. *See* ECF 1839, at 10–11. Putting aside the lack of a factual basis for this claim, Defendants' argument fails because a genuine cellphone purchased by a consumer would have resulted in identical payments to Apple and Samsung. In other words, Defendants' diversion of sales did not create new users of Apple and Samsung services, but rather shifted users from genuine cellphones to counterfeit ones.

### 2. Reasonable Estimate Based on Reliable Evidence

The proffered affidavits and information submitted by the brands established the profits lost by each through Defendants' diverted sales. Each estimated the lost profits based on the lost-sales information provided by the Government. These proffered affidavits from the victim-brands are sufficient to establish the loss here. *See Anderson*, 741 F.3d at 951–52 (recognizing that the court may rely on evidence "that possesses sufficient indicia of reliability to support its probable accuracy"). As recognized by the Ninth Circuit, "victim affidavits will generally provide sufficient, reliable evidence to support a restitution order." *See United States v. Fu Sheng Kuo*, 620 F.3d 1158, 1167 (9th Cir. 2010) (quotation omitted).

Defendants' insistence on a "precise" calculation of the exact profit margins and reductions for possible "offset" benefit to the brands misconstrues the restitution calculation. *See* ECF 1839, at 9 (arguing that restitution requires a detailed calculation by the brands of avoidable "offset" and "precise" determinations of profit margins, citing *Anderson*). When, as here, the criminal offense involves property, restitution is mandatory. *See* 18 U.S.C. § 3663A. In determining the award of restitution, the Court has considerable leeway and flexibility in assessing the victim's actual losses. *See Anderson*, 741 F.3d at 951. While "[s]peculation and rough justice are not permitted[,] . . . *exact precision is not required* and district courts do have a degree of flexibility in accounting for a victim's complete losses; thus a reasonable estimate will suffice." *Id.* at 954 (emphasis added).

Defendants' attempt to require "precise" calculations ignores the applicable standard of "reasonable estimate" and confuses the requirements.[1] The submitted affidavits from the victim-brands are more than sufficient for the Court to rely upon in making a "reasonable estimate" of the restitution amount. Moreover, these sworn statements are further supported by each companies' Securities and Exchange Commission filings. *See* Restitution Ex. 5; *see also In re Nine West LBO Securities Litig.*, 482 F. Supp. 3d 187, 204 n.20 (S.D.N.Y. 2020) (taking judicial notice of facts contained in SEC filing). Simply, the evidence of lost profits is both sufficiently specific and reliable for this Court to determine restitution. The victim-brands are entitled to recoup their losses caused by Defendants' criminal conspiracy.

## II. UL is entitled to recoup the lost fees incurred by Defendants' use of its counterfeit certification mark during the conspiracy.

UL is entitled to recover the fees it lost through Defendants' counterfeiting scheme. The extensive factual record in this case, including the facts developed at trial, is more than sufficient to support a finding of lost fees to UL for use of its certification mark.

First, UL is entitled to restitution as a victim of Defendants' crimes. Section 3663A defines "victim" as:

---

[1] Defendants ask this Court to delve into a detailed profit-margin analysis of the victim-brands. In addition to being legally unnecessary, this request raises additional concerns of the need to protect trade secrets. *See, e.g.*, *Apple Inc. v. Samsung Electronics Co., Ltd.*, 727 F.3d 1214, 1221–22, 1224 (9th Cir. 2013) (holding that district court abused its discretion in unsealing documents related to financial information of Apple and Samsung because of "the potential harm that Apple and Samsung could face if their detailed financial information becomes public"). The victim-brands are statutorily entitled to protection of their privacy and protection against further harm. *See* 18 U.S.C. § 3771(a), (b)(1). Courts have found the "broad language" of this statutory provision seeks "to promote a liberal reading of the statute in favor of interpretations that promote victims' interest in fairness, respect, and dignity." *United States v. Turner*, 367 F. Supp. 2d 319, 335 (E.D.N.Y. 2005).

> a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). Defendants' conspiracy to sell thousands of products bearing a counterfeit mark caused UL harm in both lost fees and reputational injury. Only the former serves as the basis for the requested restitution because calculation of reputational harm is too difficult to quantity for the current "reasonable estimate" calculation.

Defendants' online sales of purportedly genuine and new Apple iPhones and Samsung Galaxy cellphones to consumers introduced goods bearing UL's counterfeit certification mark to tens of thousands of consumers. For years, Defendants conspired with their overseas manufacturers to sell goods bearing counterfeit UL certification marks. Defendants were more than simply downstream consumers of these manufacturers' goods. Paul, Peter, and Tim Babichenko instructed manufacturers on how to create more passable counterfeits. *See, e.g.*, Ex. 3005-03. Overseas manufacturers and Defendants Paul, Peter, and Tim Babichenko traveled to see each other's business operations and intimately coordinated the manufacturing of their counterfeit goods. *See* Ex. 3005-39 (noting that it's "better to build phones by order" for Paul); Ex. 3005-40 (Paul telling manufacturer that the digitizer has to be changed in China); Ex. 3006-04 (telling manufacturer to put "NFC" capability on label but not actually include the antennae).

None of these manufacturers were authorized by UL to use its certification marks on their products. None had provided UL with their design and manufacturing schemes for review and testing. None of the manufacturers opened their doors for the meticulous

evaluation and inspection UL conducts for those seeking to bear its mark. Accordingly, Defendants coordinated with their manufacturers to sell thousands of products bearing a counterfeit UL mark. In so doing, Defendants deprived UL of the fees incurred to gain authorization for use of the mark.

Defendants misunderstand UL as attempting to "collect restitution on behalf of consumers," which they claim it has no "standing" to do. Not so. UL is seeking restitution only in lost fees it would have accrued had Defendants not criminally infringed on its certification mark. Accordingly, this calculation does not rest on any physical harm to a consumer or damage caused to its reputation by Defendants' introduction of thousands of unsafe and poor-performing products into consumers hands. UL is entitled to its conservative estimate of harm based solely on fees lost by Defendants' use of its counterfeit mark.

### III. Samsung and UL are entitled to recoup their reasonable costs expended to support this criminal prosecution.

UL and Samsung are entitled to full restitution of the expenses and attorney's fees associated with their participation in the Government's investigation and prosecution of this case. Both companies expended significant time and money to participate in the investigation and prosecution.

The restitution order "*shall* require that [Defendants] . . . reimburse the victim for lost income and necessary child care, transportation, and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4) (emphasis added). "The law is settled that

a court may include attorneys' fees in a restitution order when the victim incurred the expenses to participate in law enforcement's investigation and prosecution of a defendant." *United States v. Eyraud*, 809 F.3d 462, 467 (9th Cir. 2015).

Summaries of attorney's fee categories and work are sufficient. *See id.* at 471. In addition, the Court is aware of the extensive involvement of the victims in the prosecution, and the Government's explanation of a victim's involvement is a sufficient basis. *See United States v. Mirza*, 755 F. Supp. 2d 329, 333 (D. Mass. 2010) ("[T]he government justified the involvement of Huron Consulting by explaining their critical involvement in the investigation, thereby providing a rational basis for the Court to accept that charge in the total restitution order. Thus, there is more than a modicum of reliable evidence on the record to support the inclusion of the Huron Consulting charge in the restitution order." (internal citations omitted).) "[S]o long as any loss—not just those incurred during investigation or prosecution—is an 'actual loss' suffered as a result of a defendant's qualifying crime and the MVRA's causation standard is satisfied, a district court must include the amount of that loss in its restitution order." *Eyraud*, 809 F.3d at 467.

Here, UL and Samsung are entitled to the expenses and attorney's fees associated with their participation in the Government's investigation and prosecution of this case. As described in UL's submission, they expended time and money to participate in the investigation and prosecution, such as assisting in the seizure, testing, and verification of evidence, as well as the preparation and delivery of testimony. *See* ECF No. 1834-3 at 10-11 and 36-38. They also expended funds to prepare declarations and attend hearings. *See id.* Summaries were provided. UL has indicated that it will provide copies of invoices if the

Court desires. *Id.* Similarly, Samsung submitted a letter affirming the funds it expended participating in the investigation and prosecution and included a table of timekeeper hours and rates to come to the total it seeks. ECF No. 1834-2. It too could provide additional information to the Court if necessary.[2]

UL and Samsung's participation in the investigation and prosecution were necessary and reasonable. The Government needed such participation because UL and Samsung have expertise and knowledge that was necessary in all phases of the criminal process. For both UL and Samsung, the Court is aware of the extensive participation of these victims in the prosecution. Over the course of this investigation into Defendants' counterfeit trademark goods trafficking, law enforcement repeatedly turned to the brand-victims for assistance.

For example, between 2016 and 2018, trademark-holder experts examined dozens of cellphone products purchased by undercover agents from Defendants. When federal agents executed a search warrant at 12586 and 12554 Bridger Street Warehouses and recovered 60 pallets of counterfeit product, trademark-holder representatives examined items recovered from the warehouse to determine authenticity. Trademark holder representatives likewise examined thousands of products collected during the execution of a separate search warrant

---

[2] Notably, under 18 U.S.C. § 3664(d)(4), any additional information provided by the victim-brands would be privileged and subject to the confidentiality of victim-provided information through in camera review by the Court. *See also Eyraud*, 809 F.3d at 470 (holding that § 3664(d)(4) "*requires* the district court to protect the privacy of [a victim's] submissions 'to the greatest extent possible,' and specifically authorized the submission of the documents in camera").

**United States' Reply
in Support of Motion for Restitution—14**

for the outbound 2,451 packages shipped from the 12586 Bridger Street Warehouse on August 21 and 22, 2018. Consequently, by the end of this investigation, the trademark holders had examined thousands of Defendants' products to determine the authenticity of each. To record those evaluations, the trademark holders produced *thousands* of pages of reports and photographs detailing the reasons for their conclusions that the products reviewed in the case were counterfeit.

UL and Samsung continued to provide support as the investigation led to criminal charges and years of litigation. As this Court observed over the course of four years of litigation, UL and Samsung provided four different witnesses to testify during *Daubert* hearings, two different jury trials, and sentencings. UL also performed numerous tests on Defendants' products at the request of the Government and in response to a defense expert's assertion the products were "rock solid." *Compare* Ex. 2822, *with* Trial Tr. at 4932 (defense expert Neil Shirk testifying that Defendants' chargers had a "rock solid" performance). Ultimately, they will again be returning to Boise to provide more witnesses for the restitution hearing. In short, the support provided by UL and Samsung during the course of this criminal prosecution was substantial and unique. They should be compensated for their costs associated with their participation in this proceeding.

In sum, the Mandatory Victims Restitution Act requires that victims be awarded restitution for the costs they expend participating in the Government's investigation and prosecution. 18 U.S.C. §§ 3663A(b)(4). Defendants should be ordered to pay restitution to UL in the amount of $154,188.91 and to Samsung in the amount of $281,322.37 to "reimburse the victim[s] for . . . expenses incurred during participation in the investigation

or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). In addition, even if Section 3663A(b)(4) is somehow not applicable or satisfied, the losses are "actual losses" of the victims caused by the offenses of Defendants and compensable as restitution. *See* 18 U.S.C. §§ 3633A(a)(2) and (b)(1) and 3664(f)(1).

## Conclusion

The victims are entitled to recoup lost profits and fees caused by Defendants' criminal conduct, as well as the cost of supporting the investigation and prosecution.

Respectfully submitted this 31st day of May, 2023.

        JOSHUA D. HURWIT
        UNITED STATES ATTORNEY
        By:

        */s/ Katherine L. Horwitz*
        KATHERINE L. HORWITZ
        Assistant United States Attorney


        */s/ William M. Humphries*
        WILLIAM M. HUMPHRIES
        Assistant United States Attorney

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 31, 2023, the foregoing REPLY was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| |
|---|
| JOHN DEFRANCO<br>1031 E. Park Blvd.<br>Boise, ID 83712<br>jcd@greyhawklaw.com<br>*Attorney for Pavel Babichenko* |
| PAUL E. RIGGINS<br>380 South 4th Street, Ste. 104<br>Boise, ID 83702<br>rigginslaw@gmail.com<br>*Attorney for Piotr Babichenko* |
| ROBYN A. FYFFE<br>P.O. Box 5681<br>Boise, ID 83705<br>robyn@fyffelaw.com<br>*Attorney for David Bibikov* |
| ELLEN NICHOLE SMITH<br>P.O. Box 140857<br>Garden City, ID 83714<br>ellen@smithhorras.com<br>*Attorney for Mikhail Iyerusalimets* |
| ROB S. LEWIS<br>913 W. River Street, Ste. 430<br>Boise, ID 83702<br>office@roblewislaw.com<br>*Attorney for Timofey Babichenko* |

/s/ Katherine Horwitz
Assistant United States Attorney

**United States' Reply
in Support of Motion for Restitution—17**